**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, | § § § | Case No.: _____ |
| Plaintiff, | § § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| ARGUS INFORMATION & ADVISORY SERVICES INC., VERISK ANALYTICS, INC. and TRANS UNION LLC, | § § § § | |
| Defendants. | | |

## COMPLAINT

Plaintiff JPMorgan Chase Bank, National Association ("JPMC" or "Plaintiff"), by and through its undersigned counsel, brings this Complaint against Defendants Argus Information & Advisory Services Inc. (formerly known as Argus Information & Advisory Services LLC) ("Argus"), Verisk Analytics, Inc. ("Verisk"), and Trans Union LLC ("TransUnion"). Argus, Verisk, and TransUnion are each a "Defendant" and collectively are referred to herein as "Defendants." JPMC alleges as follows:

## INTRODUCTION

1.     This action centers on an elaborate, decade-long scheme by Argus and its former and current parent companies to secretly misappropriate JPMC's valuable trade secret data comprising anonymized monthly account and portfolio credit card data for tens of millions of credit card users.[1]

2.     Argus obtained access to JPMC's trade secret information as a data aggregator for (a) the Office of the Comptroller of the Currency ("OCC") and (b) the Board of Governors of the

---

[1] This case does not involve any misuse or leakage of personally identifiable information ("PII").

Federal Reserve System ("Federal Reserve Board") and the Federal Reserve Bank of Philadelphia ("FRBP") (together, "Federal Reserve").[2]  Beyond this role, Argus had *no* right to use this data. In fact, Argus' contracts with the Regulators restricted Argus' ability to use, disclose, or distribute credit card data for commercial purposes.  But, for more than ten years, Argus covertly used, retained, and disclosed JPMC's trade secrets in Argus' commercial analytics business involving the nation's largest financial institutions.  Until alerted in mid-2022 by the Regulators, JPMC knew nothing of the scheme, which included the creation and use of customized software to surreptitiously mimic JPMC's trade secret data for Argus' commercial benefit.

3.     When confronted by the Regulators, Argus admitted that (a) "certain data attributes derived from data that [was] provided to Argus by financial institutions pursuant to the Agreement [with the Regulators] were used by Argus personnel as an input into an industry scaling process that was used for another part of [Argus'] business" and (b) JPMC was "an institution whose anonymized data was inappropriately accessed or misused."

4.     Based on this and related conduct, Argus recently agreed to pay $37 million to settle a civil investigation by the Department of Justice and other federal authorities.  Emphasizing the criticality of protecting confidential data provided to banking regulators, the head of the Justice Department's Civil Division said this about the settlement:  "Companies that do business with the federal government are expected to abide by the terms of their agreements, including any restrictions on the use or disclosure of government supplied data.  We will not permit contractors to profit from the misuse of such data and to put the data at risk."

5.     Defendants indeed profited from their misuse of JPMC's trade secret data.  JPMC accordingly brings this action to recover actual damages, including unjust enrichment, and

---

[2] The OCC and the Federal Reserve are referred to collectively herein as the "Regulators."

exemplary damages caused by Defendants' willful and malicious misappropriation of JPMC's trade secrets for their own financial benefit and enjoin Defendants from further unauthorized misuse of JPMC's trade secrets.

## **PARTIES**

6.      JPMC is a bank organized under the laws of the United States with its main office in Columbus, Ohio.  JPMC is the consumer and commercial banking subsidiary of JPMorgan Chase & Co., a Delaware corporation and a U.S. banking and financial services company.  JPMC is one of the largest banks in the United States, serving customers worldwide with its deposit accounts, credit cards, mortgage loans, home equity, commercial banking, and investment services.

7.      Before 2019, JPMC's credit card business was conducted through Chase Bank USA, N.A. ("Chase"), organized under the laws of the United States with its main office in Delaware.  In 2019, Chase merged into JPMC.  At all relevant times, the core of JPMC's credit card business was and is conducted from Delaware.  Throughout this complaint, JPMC refers collectively to JPMC and Chase.

8.      Argus is a corporation incorporated under the laws of Delaware with a principal place of business in White Plains, New York.  Argus describes itself as providing "benchmarking data, analytics, models, and advisory services" to help its customers "understand their world today."

9.      Verisk is a corporation incorporated under the laws of Delaware with a principal place of business in Jersey City, New Jersey.  Verisk is a public company (Ticker Symbol: VRSK). Verisk describes itself as "relied upon by leading financial institutions, payments providers, and

retailers worldwide for competitive studies, predictive analytics, models, and advisory services to provide a clear perspective on where their business stands today."

10.     Verisk acquired Argus on August 31, 2012, for $425 million.  Verisk owned Argus for almost ten years, until April 7, 2022, when it sold Argus to TransUnion as part of a $515 million transaction.

11.     TransUnion is a limited liability company organized under the laws of Delaware with a principal place of business in Chicago, Illinois.  TransUnion is a wholly owned subsidiary of TransUnion Corporation, a Delaware corporation and public financial services company (Ticker Symbol: TRU).  TransUnion describes itself as "a leading global information and insights company that makes trust possible between businesses and consumers, working to help people around the world access opportunities that can lead to a higher quality of life."

12.     As of April 8, 2022, TransUnion acquired from Verisk the equity interests of Argus and the other businesses comprising the former Verisk Financial Services reporting unit. In February 2023, TransUnion stated its acquisition of Argus would allow it to "better serve [its] customers by providing enhanced insights and solutions" by combining Argus' "performance insights sourced from a consortium of financial institutions" with "TransUnion's authoritative datasets."

## JURISDICTION AND VENUE

13.     This civil action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, *et seq.*

14.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and § 1332.

15.     This Court has personal jurisdiction over Defendants because each Defendant is incorporated under the laws of Delaware and, upon information and belief, Defendants sell their services and products in Delaware, to Delaware companies and citizens.  Defendants have established minimum contacts within the forum such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

16.     Venue is proper under 28 U.S.C. § 1391(b)(1) because each Defendant resides in this district, and each Defendant is incorporated in Delaware.

## FACTUAL BACKGROUND

### A.  JPMC'S TRADE SECRET DATA

17.     JPMC is one of the largest credit card issuers in the United States.  JPMC estimates that in 2022 it was the number one U.S. credit card issuer based on sales and outstanding balances, with approximately 22% of the market based on credit card sales (excluding private label cards and commercial cards).

18.     JPMC maintains an extensive data compilation about its credit card business, including monthly detailed individual account-level data and compiled portfolio-level data that aggregates categories of accounts, as described herein.  JPMC's exclusive use and access to this data concerning its credit card business give it a significant competitive advantage.

19.     JPMC's compilation of monthly account and portfolio credit card data comprises JPMC's commercially valuable trade secret information at issue, *i.e.*, the data described herein that JPMC provided to Argus as a data aggregator for the Regulators ("Trade Secret Data").

20.     JPMC's Trade Secret Data contains commercially valuable account data, including:

- Period ID

- State

- Loan Source/Channel

- Average Daily Balance

- Account Origination Date

- Refreshed Credit Bureau Score

- Current Credit Limit

- Line Increase or Decrease in the Current Month

- Minimum Payment Due

- Next Payment Due Date

- APR at Cycle End

- Cycles Past Due at Month End

21.    JPMC's Trade Secret Data also contains commercially valuable portfolio data including:

- Period ID

- Total Number of New Accounts

- Managed Gross Charge-offs for the Current Month

- Managed Recoveries

- Interest and Fees Charged

- Loan Loss

- Interest Expense

- Non-Interest Expenses

22.    As the Trade Secret Data is generated from the millions of credit cards JPMC has issued to consumers across the United States and the consumers' usage of those cards, JPMC is the creator, compiler, and owner of the Trade Secret Data.

23. The Trade Secret Data is commercially valuable for many reasons. The Trade Secret Data can provide detailed insights into JPMC's customer base and JPMC's business practices, including its rates and pricing. The Trade Secret Data also derives independent economic value because it provides JPMC with detailed account and portfolio information enabling JPMC to track, *inter alia*, market trends and existing and potential business growth.

24. JPMC's Trade Secret Data is not generally known or readily ascertainable to third parties.

25. JPMC does not sell its Trade Secret Data to third parties. The Trade Secret Data cannot be properly acquired or duplicated by others.

26. JPMC has taken reasonable and extensive efforts to keep its Trade Secret Data secret.

27. JPMC has maintained and implemented numerous safeguards and security procedures to protect the Trade Secret Data. JPMC has designated the Trade Secret Data at its highest confidentiality classification. JPMC also treats any Trade Secret Data it provides to its regulators as "Confidential Supervisory Information," meaning it is nonpublic information that is exempt from agency disclosure.

28. Moreover, JPMC has maintained restrictions that limit the ability of employees to access particular servers and applications containing the Trade Secret Data. Only employees specifically approved for access by designated approvers may access the password-protected servers or applications housing the Trade Secret Data.

29. JPMC also has maintained and implemented policies and procedures designed to secure and protect its Trade Secret Data, including but not limited to technology controls that limit access to hardware and software.

**B. ARGUS MISAPPROPRIATES JPMC'S TRADE SECRET DATA AS A DATA AGGREGATOR FOR THE OCC**

30.    As part of its oversight of regulated financial institutions, the OCC charters, regulates, and supervises all national banks and federal savings associations.

31.    Beginning in approximately 2009, the OCC mandated that certain banks, including JPMC, provide the OCC with anonymized domestic credit card data (*i.e.*, data without PII) in connection with its oversight of these entities.

32.    The OCC contracted with Argus as its data aggregator to process the banks' anonymized domestic credit card data on the OCC's behalf.  The OCC's agreement with Argus restricted Argus' ability to use, disclose or distribute credit card data collected from banks for purposes other than as specified in the contract.

33.    As a bank regulated by the OCC, in approximately 2009, JPMC began submitting the Trade Secret Data directly to Argus at the OCC's express direction.

34.    A specialized team of JPMC employees, all located in Delaware, assembled and prepared the Trade Secret Data and reviewed it to ensure the data was complete and excluded any consumer's PII.  JPMC employees in Delaware then sent the encrypted Trade Secret Data to Argus, as the OCC's vendor, through a secure file transmission.

35.    JPMC understood the Trade Secret Data it was required to provide to Argus as the OCC's data aggregator would remain confidential.  Under federal law, trade secret information, such as the Trade Secret Data provided to the OCC, is exempt from disclosure under the Freedom of Information Act.

36.    The OCC assured JPMC that the Trade Secret Data it provided to Argus would remain confidential.  The OCC also confirmed to JPMC that it had contracted with Argus and

received contractual confidentiality protections as well as confidentiality agreements from individuals at Argus who would have access to the Trade Secret Data.

37.     Distinct from the aggregator work it performed for federal banking regulators, Argus also has a lucrative commercial business that provides participating credit card issuers benchmarking reports that compare a credit card issuer's performance to other participating credit card issuers on an aggregated basis ("Benchmarking Studies").  To create these reports, Argus uses anonymized but extremely confidential credit card data that the participating credit card issuers share with Argus.  Argus also offers participating card issuers separate analytics and modeling services ("Related Services") that rely on at least some of the same data used in the Benchmarking Studies.

38.     Participating card issuers use the Benchmarking Studies and Related Services to better understand the competitive landscape and improve their own marketing, performance, profitability, and risk management activities.

39.     Before 2010, virtually every major credit card issuer, including JPMC, participated in the Benchmarking Studies.

40.     Effective November 2010, JPMC withdrew from the Benchmarking Studies and discontinued its relationship with Argus.

41.     At the time, JPMC was one of the top five credit card issuers in the United States, and it accounted for almost 20% of the credit card market by the amount of sales and the balances outstanding on customer accounts.

42.     On information and belief, JPMC's decision to exit the Benchmarking Studies was a major loss for Argus and its highly profitable data analytics business.  With JPMC no longer contributing its data, the Benchmarking Studies and Related Services would lose significant value

to Argus and the other participating credit card issuers.  Further, Argus faced significant risk that other bank participants would find the Benchmarking Studies and Related Services not worth the substantial fees they paid to Argus. The ongoing viability of Argus' subscription-based business model was in jeopardy, and a critical piece of Argus' business was at risk of collapse.

43.    Accordingly, Argus secretly devised a willful and malicious scheme to misappropriate the Trade Secret Data and protect the value of its franchise at JPMC's expense.

44.    Although JPMC was no longer participating in the Benchmarking Studies, Argus still had access to the Trade Secret Data it continued to receive on a monthly basis as the OCC's data aggregator, which provided Argus with the opportunity to misappropriate the Trade Secret Data.

45.    Unbeknownst to JPMC, Argus willfully, maliciously, and improperly accessed, used, and retained the Trade Secret Data to fill the gap of losing JPMC's data for its Benchmarking Studies and Related Services—even though it knew JPMC owned the Trade Secret Data and considered it highly valuable, confidential, and proprietary.

46.    On information and belief, Argus wanted to ensure it could still represent that its Benchmarking Studies and Related Services included a significant percentage of the credit card industry to showcase the quality and quantity of data it maintained before JPMC's departure.  By misappropriating the Trade Secret Data, Argus continued the Benchmarking Studies without interruption.

47.    Unbeknownst to JPMC, Argus developed a sophisticated computer program it periodically updated that unlawfully accessed, used, and retained JPMC's Trade Secret Data to mimic that data for use and disclosure in the Benchmark Studies and Related Services Argus sold credit card issuers.

48.     On information and belief, Argus' management authorized and approved the creation of the secret specialized computer program and the misappropriation of JPMC's Trade Secret Data, and, after Verisk acquired Argus, Verisk's management knew and authorized the ongoing misappropriation of the Trade Secret Data.

49.     Argus covertly and unlawfully accessed, used, retained, and disclosed the misappropriated Trade Secret Data in its national operations and sent results of the Benchmarking Studies and Related Services incorporating the Trade Secret Data to other credit card issuers, including to credit card issuers in Delaware.

50.     After JPMC withdrew from the Benchmarking Studies in 2010, Argus never sought or obtained permission from JPMC to access, use, retain, or disclose the Trade Secret Data for the Benchmarking Studies or for any other of Argus' commercial services.

51.     The unauthorized retrieval, use, retention, and disclosure of the Trade Secret Data was a systematic effort by Argus to willfully and maliciously misappropriate that data for its own commercial benefit to unjustly enrich itself.

### C.  ARGUS CONTINUES TO MISAPPROPRIATE THE TRADE SECRET DATA AS THE FEDERAL RESERVE'S DATA AGGREGATOR

52.     The Federal Reserve also required bank holding companies and intermediate holding companies to provide anonymized credit card data for regulatory oversight.

53.     By June 2012, the Federal Reserve Board had retained Argus as its data aggregator and directed JPMC to provide anonymized credit card data to Argus.

54.     On behalf of the Federal Reserve Board, the FRBP separately retained Argus as a data aggregator and directed JPMC to provide anonymized credit card data to Argus.

55.     Argus' contracts with the Federal Reserve provided that Argus (a) would access and use the data for the sole purpose of performing the services to be provided under the contract

or as otherwise instructed in writing by the Federal Reserve and (b) would not use or exploit data submitted under the contract for its own benefit.

56.    In compliance with the Federal Reserve's requirements, JPMC provided its Trade Secret Data to Argus.

57.    JPMC reasonably believed that the Trade Secret Data it provided to Argus would be kept confidential and not misappropriated.  Under federal law, trade secret information, such as the Trade Secret Data provided to the Federal Reserve, is exempt from disclosure under the Freedom of Information Act.

58.    Under instructions from the Regulators, JPMC continued to provide Argus with the Trade Secret Data through the expiration of the Federal Reserve's agreements with Argus on July 31, 2022.  JPMC personnel in Delaware sent all such de-personalized and encrypted data to Argus through a secure file transmission.

59.    When it negotiated and signed its agreements with the Federal Reserve, Argus was already running its secret computer program using the misappropriated Trade Secret Data JPMC had provided to Argus, as the OCC's data aggregator.

60.    Argus continued to wrongfully conceal its misappropriation from JPMC.  Argus knew JPMC owned the Trade Secret Data it provided per the Regulators' direction.  Argus never sought or obtained written permission from JPMC to acquire, use, or disclose the Trade Secret Data for the Benchmarking Studies or any Related Services.

61.    As discussed, on information and belief, Argus misappropriated JPMC's Trade Secret Data to ensure it could maintain the value of its businesses, continue to market its services as including a significant percentage of the credit card industry, and maintain the quality and quantity of data it had before JPMC's departure.

62.    Indeed, and on information and belief, by willfully and maliciously misappropriating the Trade Secret Data, Argus was able to retain its existing customers of its Benchmarking Studies and Related Services and obtain new customers for the same, unjustly reaping enormous commercial and financial benefits for itself and its affiliates.

### D.  ARGUS ADMITS IT MISAPPROPRIATED JPMC'S TRADE SECRET DATA

63.    In or around September 2020, the federal government alerted Argus and Verisk to a Department of Justice investigation concerning Argus' data misappropriation.

64.    In December 2020, the Federal Reserve received written notice from Argus advising that "certain data attributes derived from data that is provided to Argus by financial institutions pursuant to the Agreement [with the Federal Reserve] were used by Argus personnel as an input into an industry scaling process that was used for another part of our business."

65.    The letter failed to identify what other parts of Argus or Verisk's businesses improperly accessed, retained, used, or disclosed the data provided to the Federal Reserve.

66.    Argus and Verisk also failed to notify JPMC that they were improperly acquiring, using, and disclosing the Trade Secret Data for other parts of their businesses, and Argus and Verisk continued to misappropriate the data.

### E.  JPMC RECEIVES A WHISTLEBLOWER LETTER, AND ARGUS AND VERISK WILLFULLY AND MALICIOUSLY MISLEAD JPMC

67.    In April 2021, JPMC received an unsigned whistleblower letter alleging that Argus and its parent Verisk were improperly disclosing JPMC credit card data to other Verisk subsidiaries.  On information and belief, the whistleblower was a Verisk employee.

68.    According to the whistleblower, Verisk's knowledge and involvement in this scheme was pervasive:

A. "Your company/bank has contributed your data to ARGUS Information over years."

B. "Argus Information is part of Verisk Group."

C. "Verisk has encouraged and facilitated data sharing across its all [sic] subsidiaries."

D. "ARGUS (banking) gathers all credit card data and share [sic] with Verisk [sic] other subsidiaries."

E. "Your data assets have become Verisk's and its subsidiaries' assets/profits over years: your data have been developed to various products and sold to a number of their clients in a number of industries."

69.    JPMC provided a copy of the whistleblower letter to Argus and requested that it confirm Argus was properly handling JPMC's valuable data.

70.    On June 23, 2021, Argus provided a written response to JPMC personnel in Delaware to address the concerns raised in the whistleblower letter. Verisk and its internal counsel reviewed and approved the response letter before Argus sent it to JPMC.

71.    In its response, Argus acknowledged receipt of the whistleblower letter and represented that it had conducted an audit and confirmed compliance with its obligations to JPMC. The Argus letter was signed by Argus' Head of Data Compliance and was copied to an Argus Senior Managing Director as well as Argus' General Counsel. Argus' response gave the impression that Argus had taken seriously the allegations and JPMC's concerns.

72.    Argus' June 23, 2021 response letter was an intentional effort to conceal its ongoing willful and malicious misappropriation and prevent JPMC from discovering Argus' unlawful conduct. Argus' response letter was purposely misleading in several respects.

14

73.    First, Argus provided assurances to JPMC that were misleading because Argus and Verisk were then aware for more than nine months of the ongoing Department of Justice investigation and knew of their improper acquisition, use, and disclosure of the Trade Secret Data. Argus had already admitted to the Federal Reserve that Argus had misappropriated the Trade Secret Data.  Indeed, Argus disclosed to JPMC that Argus had conducted an audit without also disclosing that it had determined, and already reported to a federal regulator, that Argus had misappropriated the Trade Secret Data collected pursuant to Argus' services for the Regulators for other parts of Argus' business.

74.    Second, in an ongoing effort to conceal its long-standing misconduct from JPMC, Argus provided false assurances by misleadingly defining "JPMC's Data" to include only the data JPMC had provided Argus for Benchmarking Studies**,** knowing that Argus had for more than a decade willfully and maliciously misappropriated the Trade Secret Data it obtained in its role as a data aggregator for the Regulators on a massive scale.

75.    Third, Argus intentionally misled JPMC into believing Argus had thoroughly investigated the whistleblower's allegations and determined that none of JPMC's Trade Secret Data had been misappropriated.

76.    As of April 8, 2022, TransUnion acquired the equity interests of Argus and several other businesses Verisk had owned in its Verisk Financial Services unit.

77.    Before closing the transaction, TransUnion learned from Verisk of Argus' misappropriation of data provided to it as a data aggregator for the Regulators.  After the transaction closed, TransUnion failed to notify JPMC of Argus' conduct.

78.    After the acquisition, TransUnion exclusively controlled Argus.  TransUnion installed its senior personnel as Argus' CEO and other senior management positions.

79.     As part of Argus' Related Services rendered both before and after it became part of TransUnion, Argus marketed, developed, and created a variety of complex financial models for use by its customers, and Defendants earned substantial income from such modeling services.  On information and belief, Argus misused and disclosed the Trade Secret Data in dozens of models it developed for its customers' ongoing use.

80.     Argus, Verisk, and TransUnion know that Argus built models with the Trade Secret Data.  On information and belief, Argus and TransUnion also know several of these improper Argus-created models remain in use by JPMC's competitors.  Also, on information and belief, Argus and TransUnion have failed to prevent all such models from continuing to be used or accessed by their customers or otherwise recover the models.

81.     TransUnion continued to misappropriate the Trade Secret Data to enhance its and Argus' businesses.

## G.  THE DEPARTMENT OF JUSTICE INVESTIGATES ARGUS' MISUSE OF CREDIT CARD DATA

82.     On or about July 26, 2022, TransUnion publicly acknowledged that the Department of Justice was investigating whether Argus misused data it had collected under certain government contracts, and such alleged misuse commenced before TransUnion acquired Argus.

83.     JPMC first learned of Argus' misappropriation when the Federal Reserve provided written notice dated May 31, 2022, to JPMC that Argus had misused the Trade Secret Data that was collected pursuant to Argus' contracts with the Federal Reserve.

84.     Also on May 31, 2022, the OCC provided JPMC with written notice that Argus misused the Trade Secret Data collected pursuant to Argus' contracts with the OCC.  The OCC quoted from Argus' December 2020 written notice, which stated in part, that "certain data attributes derived from data that is provided to Argus by financial institutions pursuant to the

16

Agreement were used by Argus personnel as an input into an industry scaling process that was used for another part of [Argus'] business." The OCC's notice also identified JPMC's Trade Secret Data as among the data that Argus misused.

85.    In June 2022, JPMC demanded in writing information from Argus and TransUnion concerning the misappropriation of the Trade Secret Data.

86.    In July 2022, Argus and TransUnion met with JPMC. Argus and TransUnion admitted to the misappropriation of the Trade Secret Data that JPMC had provided to the Regulators since 2010.

87.    After learning of Argus' misappropriation of the Trade Secret Data, JPMC tried to determine which Verisk businesses accessed and misused the data and what products and services Verisk and Argus had developed and sold in connection with Argus' improper retrieval, use, retention and disclosure of the data. But Verisk declined to participate in any discussions with JPMC regarding the misappropriation of the Trade Secret Data. Verisk has not publicly denied or otherwise disputed that Verisk used the Trade Secret Data in Verisk's other businesses and for its own commercial purposes.

### H. ARGUS PAYS $37 MILLION DOLLARS TO SETTLE THE DEPARTMENT OF JUSTICE INVESTIGATION

88.    On March 13, 2024, the Department of Justice announced Argus "agreed to pay the United States $37 million to resolve claims under the False Claims Act and the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), in connection with its access to and use of credit card data obtained pursuant to contracts with various federal regulators, including the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (FRB) and the Consumer Financial Protection Bureau (CFPB)." Copies

of the settlement and related Department of Justice Press Release are attached as Exhibits A and B, respectively.

89.    According to the Department of Justice, the settlement "resolves allegations that, from 2010 through 2020, Argus improperly accessed, used and retained anonymized credit card data that it received under the contracts.  The United States alleged that Argus used this anonymized data to create synthetic (proxy) data that it incorporated into the products and services it sold to some commercial customers in place of actual data from certain banks.  The United States further alleged that Argus failed to disclose its improper access, use and retention of credit card data to the United States and the extent to which it relied on synthetic data to its commercial clients."

90.    Commenting on the settlement, one Department of Justice official stated:  "We will hold companies accountable when they breach their agreements with regulators and misuse sensitive data for their own commercial gain."

<u>**COUNT ONE**</u>

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.)**

**[Against All Defendants]**

91.    All previous paragraphs are incorporated herein as if fully set forth.

92.    Defendants have misappropriated the Trade Secret Data JPMC provided to Argus as a data aggregator for the Regulators.

93.    JPMC owns the Trade Secret Data.

94.    The Trade Secret Data was used in interstate and/or foreign commerce.

95.    By, among other things, storing the Trade Secret Data on secure servers, keeping them password protected, providing access to the Trade Secret Data to only select employees with

a business need to view them, and sharing the data only with third parties who signed non-disclosure agreements to use the data for solely limited business purposes, JPMC has taken reasonable measures to keep its data secret.

96.    The Trade Secret Data is immensely valuable, as it provides detailed insights into, *inter alia*, JPMC's credit card practices, policies, and growth, based on JPMC's customers' spending habits, payment histories, engagement in rewards programs, and special JPMC offers.

97.    The Trade Secret Data derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the data.  The Trade Secret Data provides detailed insights into JPMC's customer base and JPMC's business practices that are confidential and not publicly known or ascertainable.

98.    Defendants unlawfully accessed, used, retained, and disclosed the Trade Secret Data.  The Regulators mandated JPMC to provide the data to Argus as a federally sanctioned data aggregator, and Argus was forbidden from using the Trade Secret Data or disclosing the Trade Secret Data for other purposes.

99.    Defendants willfully and maliciously misappropriated the Trade Secret Data by breaching its duty to maintain its secrecy and accessing, using, retaining, and disclosing it in the Benchmarking Studies and Related Services.

100.    On information and belief, Argus shared the Trade Secret Data with Verisk for use in Verisk's other businesses, and Verisk used the Trade Secret Data for its own commercial purposes.  Indeed, around 2018, Verisk retained Argus' Chief Information Officer to serve in the same role at Verisk.  On information and belief, Verisk knew that Argus was misappropriating the Trade Secret Data.

101.    In its public filings, TransUnion stated the Argus acquisition enhanced TransUnion's business and services to its customers by combining its existing "authoritative datasets" with Argus' "performance insights sourced from a consortium of financial institutions." On information and belief, Argus shared its insights sourced from the Trade Secret Data with TransUnion for use in TransUnion's businesses, and TransUnion used the Trade Secret Data for its own commercial purposes.

102.    Argus used and disclosed the Trade Secret Data in numerous models it created, developed, and marketed for its customers' ongoing use.  On information and belief, several Argus-created models remain in use by Argus' customers who are JPMC's competitors. Defendants knew that those models were built using misappropriated Trade Secret Data.

103.    Upon information and belief, Defendants earned revenue from their customers on such models.  Moreover, Argus and TransUnion have not taken steps to (a) prevent all such models from continuing to be used or accessed by their customers, (b) modify the models to remove all aspects of the models that were built using the Trade Secret Data, and/or (c) otherwise recover all models that were built using the Trade Secret Data.

104.    JPMC never consented to Defendants' unlawful retrieval, use, retention, or disclosure of the Trade Secret Data it provided to Argus.

105.    Defendants' willful and malicious trade secret misappropriation damaged JPMC and unjustly enriched Defendants.  Argus knowingly and continuously used and disclosed the Trade Secret Data to enhance the Benchmarking Studies and Related Services and to continue to profit from them, all of which it sold to its customers (at least some of whom are JPMC's direct competitors) who were or became customers of the Benchmarking Studies and Related Services. Upon information and belief, Verisk also used or disclosed the Trade Secret Data for one or more

of its other businesses. Further, TransUnion was also unjustly enriched by its use of the Trade Secret Data in its other businesses.

106.    Due to Defendants' willful and malicious conduct, JPMC is entitled to damages including but not limited to lost profits, unjust enrichment, a reasonable royalty, and attorney's fees and costs, as well as an injunction against Defendants for any ongoing improper conduct.

107.    By, *inter alia*, willfully and maliciously misappropriating the Trade Secret Data, secretly developing and deploying a specialized and sophisticated computer program to leverage the data for its own commercial purposes, revising and enhancing that computer program over time to improve its ability to misuse the Trade Secret Data for its own commercial purposes, taking steps to use and share the Trade Secret Data, and taking steps to prevent JPMC from learning of Defendants' improper conduct, Defendants' trade secret misappropriation was willful and malicious, and JPMC is entitled to exemplary damages in addition to compensatory damages.

## COUNT TWO

### (Violation of the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, et seq.)

### [Against All Defendants]

108.    All previous paragraphs are incorporated herein as if fully set forth.

109.    Defendants have misappropriated the Trade Secret Data JPMC provided to Argus as a data aggregator for the Regulators.

110.    JPMC owns the Trade Secret Data.

111.    By, among other things, storing the Trade Secret Data on secure servers, keeping them password protected, providing access to the Trade Secret Data to only select employees with a business need to view them, and sharing the data only with third parties who signed non-

disclosure agreements to use the data for solely limited business purposes, JPMC has taken reasonable measures to keep its data secret.

112.    The Trade Secret Data is immensely valuable, as it provides detailed insights into, *inter alia*, JPMC's credit card practices, policies, and growth, based on JPMC's customers' spending habits, payment histories, engagement in rewards programs, and special JPMC offers.

113.    The Trade Secret Data derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the data.  The Trade Secret Data provides detailed insights into JPMC's customer base and JPMC's business practices that are confidential and not publicly known or ascertainable.

114.    Defendants unlawfully accessed, used, retained, and disclosed the Trade Secret Data.  The Regulators mandated JPMC to provide the data to Argus as a federally sanctioned data aggregator, and Argus was forbidden from using the Trade Secret Data or disclosing the Trade Secret Data for other purposes.

115.    Defendants willfully and maliciously misappropriated the Trade Secret Data by breaching its duty to maintain its secrecy and accessing, using, retaining, and disclosing it in the Benchmarking Studies and Related Services.

116.    On information and belief, Argus shared the Trade Secret Data with Verisk for use in Verisk's other businesses, and Verisk used the Trade Secret Data for its own commercial purposes.  Indeed, around 2018, Verisk retained Argus' Chief Information Officer to serve in the same role at Verisk.  On information and belief, Verisk knew that Argus was misappropriating the Trade Secret Data.

117.    In its public filings, TransUnion stated the Argus acquisition enhanced TransUnion's business and services to its customers by combining its existing "authoritative datasets" with Argus' "performance insights sourced from a consortium of financial institutions." On information and belief, Argus shared its insights sourced from the Trade Secret Data with TransUnion for use in TransUnion's businesses, and TransUnion used the Trade Secret Data for its own commercial purposes.

118.    Argus used and disclosed the Trade Secret Data in numerous models it created, developed, and marketed for its customers' ongoing use.  On information and belief, several Argus-created models remain in use by Argus' customers who are JPMC's competitors. Defendants knew that those models were built using misappropriated Trade Secret Data.

119.    Upon information and belief, Defendants earned revenue from their customers on such models.  Moreover, Argus and TransUnion have not taken steps to (a) prevent all such models from continuing to be used or accessed by their customers, (b) modify the models to remove all aspects of the models that were built using the Trade Secret Data, and/or (c) otherwise recover all models that were built using the Trade Secret Data.

120.    JPMC never consented to Defendants' unlawful retrieval, use, retention, or disclosure of the Trade Secret Data it provided to Argus.

121.    Defendants' willful and malicious trade secret misappropriation damaged JPMC and unjustly enriched Defendants.  Argus knowingly and continuously used and disclosed the Trade Secret Data to enhance the Benchmarking Studies and Related Services and to continue to profit from them, all of which it sold to its customers (at least some of whom are JPMC's direct competitors) who were or became customers of the Benchmarking Studies and Related Services. Upon information and belief, Verisk also used or disclosed the Trade Secret Data for one or more

of its other businesses. Further, TransUnion was also unjustly enriched by its use of the Trade Secret Data in its other businesses.

122.    Due to Defendants' willful and malicious conduct, JPMC is entitled to damages including but not limited to lost profits, unjust enrichment, a reasonable royalty, and attorney's fees and costs, as well as an injunction against Defendants for any ongoing improper conduct.

123.    By, *inter alia*, willfully and maliciously misappropriating the Trade Secret Data, secretly developing and deploying a specialized and sophisticated computer program to leverage the data for its own commercial purposes, revising and enhancing that computer program over time to improve its ability to misuse the Trade Secret Data for its own commercial purposes, taking steps to use and share the Trade Secret Data, and taking steps to prevent JPMC from learning of Defendants' improper conduct, Defendants' trade secret misappropriation was willful and malicious, and JPMC is entitled to exemplary damages in addition to compensatory damages.

## DEMAND FOR JURY

JPMC respectfully demands a trial by jury for all causes of action.

## PRAYER FOR RELIEF

WHEREFORE, JPMC prays that the Court enter judgment as follows:

A.    Enjoin Defendants from improperly acquiring, using, or otherwise disclosing JPMC's Trade Secret Data;

B.    Award JPMC damages adequate to compensate for Defendants' misappropriation of JPMC's Trade Secret Data including, but not limited to, lost profits, unjust enrichment, and a reasonable royalty as a result of the misappropriations;

C.    Award exemplary damages to JPMC owing to the willful and malicious nature of Defendants' trade secret misappropriation acts up to the statutory maximum;

D.      Award JPMC an accounting for Defendants' wrongful acts;

E.      Award JPMC its reasonable attorneys' fees and costs, as well as prejudgment interest and post-judgment interest on its damages, attorneys' fees, and costs;

F.      Award JPMC such equitable relief which may be requested and to which JPMC is entitled; and

G.      Award JPMC any other and further relief as this Court deems just and proper.

Dated:  March 19, 2024

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/Amy M. Dudash*
Amy M. Dudash (#5741)
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: 302.574.3000
Fax: 302.574.3001
amy.dudash@morganlewis.com

Julie S. Goldemberg
Phillip Wolfe
2222 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5000
Fax: 215.963.5001
julie.goldemberg@morganlewis.com
phillip.wolfe@morganlewis.com

Michael J. Abernathy
Maria E. Doukas
110 N. Wacker Drive, Suite 2800
Chicago, IL 60601-5094
Telephone: 312.324.1000
Fax: 312.324.1001
michael.abernathy@morganlewis.com
maria.doukas@morganlewis.com

*Attorneys for Plaintiff JPMorgan Chase
Bank, National Association*