IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JPMORGAN CHASE BANK,
NATIONAL ASSOCATION,

       *Plaintiff,*

     v.

ARGUS INFORMATION & ADVISORY
SERVICES INC.; VERISK ANALY-
TICS, INC.; TRANS UNION, LLC,

      *Defendants.*

No. 1:24-cv-00348-SB

---

Amy Michele Dudash, Jody Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Julie S. Goldemberg, Phillip Wolfe, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; Maria E. Doukas, Michael J. Abernathy, MORGAN, LEWIS & BOCKIUS LLP, Chicago, Illinois; William R. Peterson, MORGAN, LEWIS & BOCKIUS LLP, Houston, Texas.

*Counsel for Plaintiff.*

Kevin Michael Coen, Phillip Reytan, Rudolph J. Scaggs, Jr., Sara Carnahan, MORRIS, NICHOLS, ARSHT & TUNNELL LPP, Wilmington, Delaware; David H. Wollmuth, Joshua M. Slocum, Roselind F. Hallinan, WOLLMUTH MAHER & DEUTSCH LLP, New York, New York; Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Alexandre Tschumi, Viola Trebicka, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California, William A. Burck, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington D.C.

*Counsel for Defendants.*

---

**MEMORANDUM OPINION**

February 5, 2025

BIBAS, *Circuit Judge*, sitting by designation.

Today, every economic act—every purchase, every check deposit, every loan—leaves an electronic trace. These data are like puzzle pieces, each showing one small part of the American economy. So companies are eager to collect them and fit them together to see the full economic picture. This case is about those data: who owns them, who can use them, who can sue to protect them. JPMorgan alleges that defendants misappropriated its credit-card data, and defendants have moved to dismiss. I partly deny and partly grant the motion.

## I. ARGUS USES JPMORGAN'S DATA WITHOUT PERMISSION

JPMorgan Chase Bank is one of America's biggest credit-card issuers. Compl. D.I. 1, ¶ 17. Every month, millions of Americans swipe JPMorgan credit cards at gas stations, restaurants, and supermarkets across the country. *See id.* ¶ 22. That gives the bank a unique window into each cardholder's behavior. *Id.* ¶ 18. And the bank can combine these data to reveal patterns about groups of consumers and trends across entire markets, which it can capitalize on. *See id.* ¶¶ 18, 21. All of this makes these data quite valuable to JPMorgan. *Id.* ¶¶ 23, 96–97.

It also makes them valuable to regulators. The Office of the Comptroller of the Currency and the Federal Reserve both regulate the nation's banks. *Id.* ¶¶ 30, 52. Banks' credit-card operations affect their overall health, so these regulators require certain banks, including JPMorgan, to send them their credit-card data. *Id.* ¶¶ 31, 52. But the regulators do not handle this transfer themselves. They have contracted with a private third party, Argus Information & Advisory Services, who gets the data from the banks and processes it for the regulators. *Id.* ¶¶ 32–33, 53–54.

Yet Argus has interests of its own. Separate from collecting data for financial regulators, it also analyzes market data for financial companies. *Id.* ¶¶ 8, 37; D.I. 32 at 1. Credit-card data are core to that analysis. For instance, Argus sells financial companies benchmarking studies that compare their performance to their competitors' based on those data. Compl. ¶ 37.

So two streams of credit-card data were flowing to Argus. In one, regulators required financial institutions to send Argus their data, which Argus processed for the regulators. In the other, credit-card issuers voluntarily sent Argus their data, which Argus used for reports that it sold for profit. These streams were not supposed to cross. Argus's contracts with regulators forbade it to take data from the regulatory stream and use it for its own business. *Id.* ¶¶ 32, 55.

JPMorgan was sending Argus data in both streams: to send to financial regulators and to use in Argus's private benchmarking studies. *Id.* ¶¶ 39, 44. But in 2010, JPMorgan withdrew from the benchmarking studies. *Id.* ¶ 40. That withdrawal left a gaping hole in Argus's dataset: JPMorgan was one of the biggest credit-card issuers in the country, responsible for almost 20% of sales and customer account balances. *Id.* ¶ 41. JPMorgan was still sending Argus the same data in the other stream to process for regulators.

To fill this gaping hole, Argus allegedly took JPMorgan's data from the regulatory stream and illicitly used them for the benchmarking studies. *Id.* ¶¶ 45–51, 59–62. Argus has already settled a claim that the United States brought against it for this misuse, which would have violated Argus's government contracts. *Id.* ¶ 88. Yet

JPMorgan claims that this conduct violated its rights in the data, too. *Id.* ¶¶ 92–93, 109–110. So it brought claims under the federal Defend Trade Secrets Act (DTSA or federal Act) and Delaware Uniform Trade Secrets Act (DUTSA or Delaware Act) against Argus; Verisk Analytics, which owned Argus from 2012 to 2022; and TransUnion, which bought Argus in 2022. *Id.* ¶¶ 10, 12–13. Defendants now move to dismiss. D.I. 30; D.I. 32; D.I. 34.

## II. JPMORGAN HAS ARTICLE III STANDING

Defendants first try to cut off JPMorgan's claims by arguing that it lacks Article III standing. To have standing, JPMorgan must allege that defendants dealt it a concrete injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As defendants see it, JPMorgan alleges only that they misused its trade secrets, not that this misuse hurt JPMorgan. D.I. 32 at 17. So, they conclude, JPMorgan has alleged only a bare violation of law. *Id.* at 18.

They are wrong. An injury is concrete if it "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (internal quotation marks omitted); *Barclift v. Keystone Credit Servs.*, 93 F.4th 136, 144–45 (3d Cir. 2024). Under that rule, misappropriation of trade secrets is itself a concrete injury; no further harm is needed.

American courts have recognized misappropriation claims since 1837. Mark A. Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, 61 Stan. L. Rev. 311, 315 (2008) (citing *Vickery v. Welch*, 36 Mass. (19 Pick.) 523, 527 (1837)). The harm underlying this venerable action was a breach of confidence, not financial

4

injury. At common law, a trade secret's owner could sue if (1) the defendant used a trade secret and (2) that use "constitute[d] a breach of confidence reposed in him." Restatement (First) of Torts §757 (Am. L. Inst. 1939). Monetary harm was not required. *Id.* That is because this cause of action did not vindicate property rights but rather "a general duty of good faith." *Id.* cmt. a; *see also E.I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917).

Modern misappropriation claims stem from the same harm. A plaintiff alleging misappropriation today must plead that the defendant shared or used his trade secret in violation of a duty—for instance, by using a secret that the defendant knows was stolen or by knowingly using it without consent. 18 U.S.C. §1839(5) (federal Act); Unif. Trade Secrets Act §1(2) (1985) (uniform act adopted by many states). So any plaintiff who makes out a claim for misappropriation has alleged a breach of confidence, just like his predecessor at common law. That includes JPMorgan. Compl. ¶¶ 2, 32, 36, 55. It has pleaded a concrete injury and thus has standing.

### III. JPMORGAN HAS STATED A CLAIM UNDER THE FEDERAL DTSA

To state a claim under the federal Act, JPMorgan must allege the statute's elements are met. That issue is easy here. And to have a cause of action, JPMorgan must also be the trade secret's owner. That issue is hard. But JPMorgan clears both bars.

### A. JPMorgan alleges the elements of a DTSA claim

To make out a claim under the federal Act, JPMorgan must allege (1) a trade secret (2) connected to interstate commerce (3) that defendants misappropriated. *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). It has.

1. *JPMorgan alleges a trade secret*. Under the federal Act, information is a trade secret if (1) its owner "has taken reasonable measures to keep [it] secret" and (2) its economic value comes partly from the fact that competitors do not know it. 18 U.S.C. § 1839(3). JPMorgan meets both elements.

It alleges that it took reasonable measures to keep the data secret. It says it keeps the data confidential, lets only designated employees see them, protects the data with passwords, and limits access to the hardware and software containing the data. Compl. ¶¶ 28–29, 95. Defendants respond that JPMorgan could have taken even more precautions but did not. D.I. 34 at 17–19. But on a motion to dismiss, I cannot consider these factual allegations lobbed from outside the pleadings. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). And under the federal Act, JPMorgan need allege only that it took *reasonable* measures to protect the data, not every measure an opponent can dream up. *Houser v. Feldman*, 569 F. Supp. 3d 216, 229 (E.D. Pa. 2021). It has done that here.

As for economic value, JPMorgan alleges that its data were valuable in part because they were secret. They are a trove of information about customers and the market, giving JPMorgan a competitive edge that would be dulled if everyone else knew them. *See* Compl. ¶ 23. So it has pleaded a trade secret.

2. *The trade secret is connected to interstate commerce*. JPMorgan gathered its data from credit cards swiped across the country, and JPMorgan is a nationwide bank that uses this information to make money from coast to coast. *Id.* ¶¶ 6, 22, 94.

6

3. *JPMorgan alleges that Argus misappropriated the data.* As relevant here, a defendant misappropriated a trade secret if it (1) "use[d] a trade secret of another" (2) "without express or implied consent" and (3) knew that the trade secret was "acquired under circumstances giving rise to a duty to maintain [its] secrecy … or limit [its] use." 18 U.S.C. § 1839(5)(B).

JPMorgan has alleged all three. It says defendants used its trade secrets by exploiting its confidential data to improve Argus's reports. Compl. ¶¶ 45–51, 59–62; *Oakwood*, 999 F.3d at 908–09. It says it did not consent to this. Compl. ¶¶ 104, 120. And it says defendants knew that they had gotten the trade secrets under circumstances creating a duty to limit their use: Argus's contracts with regulators forbade it to use regulatory data for its side business, and it is plausible that Argus and its parent companies knew that. *Id.* ¶¶ 2, 32, 36, 55.

While defendants are willing to posit that these contracts created a duty to *the government* not to misuse the data, they insist JPMorgan must show that Argus owed *it* a duty. D.I. 34 at 19. But that is not what the federal Act says. It is enough if the defendant had "*a* duty to maintain the secrecy of the trade secret or limit [its] use." 18 U.S.C. § 1839(5)(B)(ii)(II) (emphasis added). That duty need not have been owed to the plaintiff. I will not add words to the statute that Congress chose not to. JPMorgan has alleged the elements of a claim under the federal Act.

## B. JPMorgan has the right to sue under the federal Act

But checking off the statute's elements is different from having the right to sue under it. Only a trade secret's owner can bring a federal claim. 18 U.S.C. § 1836(b)(1). JPMorgan plainly owned its data before it sent them to regulators. But defendants

trot out Argus's contracts with the government and a set of federal regulations to argue that under their terms, when JPMorgan sent its data to Argus, ownership of those data passed from JPMorgan to the government. I disagree.

1. *I may consider the contracts, though they were not attached to the complaint.* Before interpreting the contracts, I must answer a threshold question: whether I can even consider the parts of the contracts cited by defendants. These provisions were not mentioned in the complaint, so ordinarily I could not consider them on a motion to dismiss. Fed. R. Civ. P. 12(d). But I can consider the contracts in full if the complaint relies on them. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Alito, J.); *PBGC v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

JPMorgan's complaint does. It invokes the contracts' provisions limiting Argus's use of the information. Compl. ¶¶ 2, 32, 36, 55. And it uses those provisions to show that Argus owed a duty not to use JPMorgan's data, a required element of JPMorgan's federal and Delaware claims. *Id.* ¶¶ 98–99, 114–15; 18 U.S.C. § 1839(5)(B)(ii)(II); Del. Code Ann. tit. 6, § 2001(2)(b)(2)(B). The complaint thus relies on Argus's contracts as a Jenga tower relies on its last load-bearing piece: take out the contracts, and both claims would come tumbling down. *See Burlington Coat Factory*, 114 F.3d at 1426.

To be fair, JPMorgan did not see Argus's contracts with regulators until defendants attached them to the motions to dismiss. D.I. 67 at 35:22–36:1. One reason why courts feel comfortable considering documents on which a complaint relies is that the plaintiff has presumably read them. So when the defendant volleys back other parts

of those documents, the plaintiff will not be caught by surprise. *PBGC*, 998 F.2d at 1196–97. In a different case, I would worry about fair notice.

But in this case, those worries are academic. Because I conclude that these contracts do not defeat JPMorgan's claims, any surprises they contained did not prejudice the company. I thus consider the contracts in their entirety, including portions that do not appear in the complaint.

2. *Argus's contracts with regulators did not strip JPMorgan of its rights in its data.* Defendants point out that each contract says that the *regulators* own the data that Argus collects on their behalf. D.I. 33-1 at 35; D.I. 33-2 at 38; D.I. 33-4 at 61; D.I. 33-5 at 3. Some contracts even decree that the government is the "sole" or "exclusive" owner of the data. D.I 33-1 at 34; D.I. 33-5 at 4. So, defendants conclude, the data did not belong to JPMorgan.

Yet defendants misread the contracts. Federal contracts are governed by the rules of federal common law. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). One of those rules is that courts read each term in the context of the whole contract. *Kenneth Reed Constr. Corp. v. United States*, 475 F.2d 583, 586 (Ct. Cl. 1973); *Tilley Constructors & Eng'rs, Inc. v. United States*, 15 Cl. Ct. 559, 563 (1988).

Here, the contracts focus on the relationship between Argus and the regulators, not the rights of third parties. They create the Argus-government relationship and define each side's rights and duties: which *party* bears the risk of loss, which *party* has what rights if the other defaults, which *party* owns any copyrights, which *party* indemnifies the other, which *party* may extend the contract or terminate it. *E.g.*, D.I.

9

33-1 at 10–22, 42, 61; D.I. 33-2 at 26–27, 38–39, 55; D.I. 33-4 at 73, 103–04, 116–17; D.I. 33-5 at 14–15. So when the contracts turn to ownership, the surrounding context shows that those provisions, too, govern which *party* owns the data. They do not resolve ownership rights between the government and nonparties like JPMorgan.

The ownership sections confirm this reading. Take Argus's contracts with the Comptroller. In one, the contract declares that the Comptroller owns the data, then elaborates that "*[t]he contractor* shall have no rights in such data or deliverables." D.I. 33-1 at 35 (emphasis added). Another gives the Comptroller rights in the data, then reserves some rights to Argus—again implying that the contract is setting ownership rights between those parties. D.I. 33-2 at 38–39. The contract with the Federal Reserve Board of Governors has a similar focus. Its clause granting ownership to the Board says that "the Board's ownership rights … shall be set forth" in procurement regulations that discuss what rights *contractors* surrender to the government and what rights they retain. D.I. 33-4 at 61; FAR 52.227-17–19. So even when read in isolation, the contracts' ownership clauses divide rights between the regulators and Argus, not between the regulators and third parties.

Nor is it clear how these contracts even could strip JPMorgan of its rights. A cornerstone of property law is the maxim *nemo dat quod non habet*: a party cannot transfer rights that it does not have. *Anderson Excavating, LLC v. Weiss World L.P.*, 638 F. Supp. 3d 525, 534 (W.D. Pa. 2022); *Mitchell v. Hawley*, 83 U.S. 544, 550 (1872). Defendants do not claim that JPMorgan ever gave Argus ownership rights in these

data. Because Argus never acquired JPMorgan's ownership rights, it could not contract them away.

3. *Federal regulations do not strip JPMorgan of ownership of its trade secrets*. Defendants next try to do away with JPMorgan's ownership rights using federal regulations. Recall that JPMorgan submitted data to the Federal Reserve and the Comptroller of the Currency. Defendants claim that each agency's regulations, as well as federal contracting rules, deprive JPMorgan of its ownership rights in that data. D.I. 32 at 10–11. This argument also misfires.

*First,* take the data that JPMorgan sent to the Fed. Defendants think these data are what regulations call "confidential supervisory information." *Id.* at 10; 12 C.F.R. § 261.2(b)(1). That would matter because another regulation provides that "[a]ll confidential supervisory information … remains the property of the [Federal Reserve] Board." 12 C.F.R. § 261.20(a). Defendants insist that the data thus do not belong to JPMorgan but instead to the Fed.

JPMorgan disputes whether these data are confidential supervisory information. D.I. 45 at 9–10. But even if they are, the Fed's regulations would not destroy JPMorgan's ownership rights. Instead, in context, the regulations ensure that the Fed keeps ownership over information that it already owns despite sharing it with others. They do not let the Fed seize all rights in information that others, like JPMorgan, send to it.

The regulations focus on restricting information leaving the Fed, not information coming into it. Start with their introduction. It announces that the cited provisions

"set[] forth[] … [t]he procedures for disclosure" and complying with subpoenas. 12 C.F.R. §261.1(b)(3). Turning to the provisions themselves, they do indeed say that confidential supervisory information "remains the property of the Board." §261.20(a). But they then explain that this means the Board keeps control of information it shares with others: "no person, entity, agency, or authority to whom the information is made available or who otherwise possesses the information" may use it for unauthorized purposes; "[t]he disclosure of confidential supervisory information … shall not constitute a waiver by the Board of any applicable privileges"; and the Board has other rights about disclosure. §261.20(a)–(c).

Plus, to remain means "[t]o continue in the same place (or with the same person)." *Remain*, *Oxford English Dictionary* (2d ed. 1991). To say that the information *remains* the Board's property, then, is to say that the Board continues to own it, not that it becomes the Board's property when it was not before.

That makes sense, given what the regulations contemplate as examples of confidential supervisory information: "reports of examination, inspection, and visitation; confidential operating and condition reports; supervisory assessments; investigative requests for documents or other information; and supervisory correspondence." §261.2(b)(1). These are documents that the regulators created and thus already own, not trade secrets created by somebody else that then come into the Board's possession.

So the Federal Reserve regulations say that (1) the Board keeps ownership rights it already had (2) after disclosing information. They do not transfer ownership of JPMorgan's trade secrets from the bank to the government.

*Second,* consider the data that JPMorgan submitted to the Comptroller. Defendants claim that these data are what federal regulations call "non-public OCC information." *See* D.I. 55 at 6. Regulations declare that such information "is the property of the Comptroller." 12 C.F.R. § 4.32(b)(2). So, defendants argue, it is not the property of JPMorgan.

Once again, JPMorgan responds by denying that its data qualify as non-public OCC information. *See* D.I. 45 at 9–10. But once again, that threshold question does not matter: even if these data are non-public OCC information, the regulations do not strip JPMorgan of its ownership rights.

When the regulations call non-public OCC information "the property of the Comptroller," that is ambiguous. Does that mean the Comptroller owns its copy of the record but not JPMorgan's, like a reader owns his copy of a book? Or does the Comptroller own the intellectual property embodied in any copy anywhere, like an author owns the rights to a book's contents even when the physical document belongs to someone else? Does the regulator merely preserve rights in information it already owns? Or does it acquire exclusive ownership of the information banks send it? Property is a bundle of sticks; saying only that the Comptroller has property rights does not pick out which sticks it has.

I can resolve this ambiguity by looking at surrounding provisions and the role of the vague term in the overall scheme. *See, e.g., Yates v. United States*, 574 U.S. 528, 540–41 (2015) (plurality); *King v. Burwell*, 576 U.S. 473, 493, 497 (2015). Read in context, the Comptroller's property rights let it stop others from accessing non-public

13

OCC information; they do not extinguish JPMorgan's intellectual property rights in its own data.

Start with the regulations' textual description of their purpose and scope. The stated purposes include handling requests for non-public OCC information, asserting evidentiary privileges over it, and balancing the public's interest in transparency with the Comptroller's interest in confidentiality. 12 C.F.R. § 4.31(a)(1)–(2). They thus focus on public access to the information, not seizing ownership of intellectual property from private entities. The regulatory scope confirms this view: "This subpart applies to requests for, and dissemination of, non-public OCC information." § 4.31(b)(1).

That makes sense. As a bank supervisor, the Comptroller takes in lots of confidential information from America's financial institutions. It has a strong interest in keeping these sensitive documents private to encourage banks to share candid and complete information. It has no interest in exploiting them as trade secrets.

Plus, the regulations are found in a subpart whose provisions all deal with disclosure. They explain how the Comptroller should consider requests to release non-public OCC information (§ 4.35), with whom it can share the information (§ 4.36), limits on disclosure (§ 4.37), disclosure in judicial proceedings (§§ 4.38–39), and fees owed by people who ask for this information (§ 4.40). Their focus is unmistakably and solely on controlling the flow of information to the public, not seizing banks' intellectual property rights.

14

Finally, when the regulations explain the consequences of the Comptroller's property rights, they describe controlling access to the information. Section 4.36(d) says: "All non-public OCC information remains the property of the [Comptroller]"—so nobody else can disclose, copy, or remove it without the Comptroller's consent. Section 4.37(c) repeats that: "All non-public OCC information … is [Comptroller] property"—so the agency may "condition its use on appropriate confidentiality protections." In both cases, when the regulations declare that information is the Comptroller's property, the relevant property right is controlling access to the information, not using its intellectual property or launching suits to protect it as a trade secret. True, defendants cite another statement that this information is the Comptroller's property. D.I. 32 at 10–11 (citing §4.32(b)(1)–(2)). But when adjacent provisions use those same words to confer one set of property rights—the rights to control access to the information—Section 4.32 presumably does too. These regulations do not strip JPMorgan of its rights.

Defendants also point to procurement regulations, but those do not change matters for the data sent to the Comptroller or the Fed. True, as defendants stress, these regulations give the government "unlimited rights" in data that contractors send it. FAR 52.227-14(b)(1), 52.227-17(b)(1)(i). But the regulations divvy up rights between the government and its contractors. FAR 52.227-14(b), 52.227-17(b). So in context, "unlimited rights" merely marks out rights between those parties, not between the government and third parties like JPMorgan.

15

### C. It is too early to sort out pre-2016 misappropriation

The federal Act covers misappropriation only if it "occurs on or after" the date the law was enacted: May 11, 2016. Defend Trade Secrets Act of 2016, Pub. L. No. 114–153, 130 Stat. 376, 381–82. It also applies to misappropriation that started before the law's enactment and continued after. *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017).

JPMorgan plausibly alleges that defendants misappropriated data after the federal Act's enactment: the bank started sending Argus its data for regulatory purposes around 2012, learned in 2020 that Argus and Verisk might have been misusing its data, and now says that TransUnion kept misappropriating the data after it bought Argus in 2022. Compl. ¶¶ 10, 40, 53, 56, 63 81. So any misappropriation likely happened between 2012 and today, a window that includes dates covered by the federal Act. So that Act's effective date is not a reason to dismiss the claim.

Still, defendants want me to dismiss any claim that they misappropriated JPMorgan's trade secrets before 2016. D.I. 32 at 12. In theory, they are right: misappropriation that started and stopped before 2016 lies outside the federal Act's reach. But in practice, it is too early to sift through each discrete act of misappropriation and sort it into the pre- or post-federal-Act column. That depends on when defendants started using each line of data, when they stopped, and whether any given piece of pre-2016 data lived on in future Argus products. Those are factual questions that I cannot resolve on a motion to dismiss. Defendants may try again at summary judgment.

16

### IV. I Dismiss the Delaware DUTSA Claim Without Prejudice

JPMorgan also brings a claim under the Delaware Act protecting trade secrets. But that Act does not reach defendants' conduct, so I dismiss this claim.

Delaware law does not apply to conduct in other states unless there is clear evidence that the legislature intended it to. *Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020); *Wit Software v. Talkdesk, Inc.*, No. 23-94, 2023 WL 3454193, at *9 (D. Del. May 15, 2023). There is no such evidence for the Delaware Act, so Delaware courts hold that it does not apply to conduct that happened elsewhere. *Id.* (both sources). So if defendants did not misappropriate JPMorgan's trade secrets in Delaware, then the Delaware Act does not apply.

JPMorgan does not allege that defendants misappropriated its data in Delaware. In fact, the complaint notes that defendants' principal places of business are out of state. Compl. ¶¶ 8–9, 11. If anything, this suggests that the misappropriation happened somewhere else.

True, JPMorgan alleges that some relevant things happened in Delaware: all parties are incorporated there, JPMorgan runs its credit-card business from there, its employees prepared the trade secrets and sent them from Delaware, and Argus allegedly sold its benchmarking studies to companies in Delaware. *Id.* ¶¶ 6–9, 11, 34, 49, 58. But Delaware courts do not apply the Delaware Act when the *misappropriation* happened in another state. *See Focus Fin.*, 250 A.3d at 970; *AlixPartners, LLP v. Mori*, C.A. No. 2019-0392, 2022 WL 1111404, at *18 (Del. Ch. Apr. 14, 2022). And here, any misappropriation would have happened when defendants improperly used

or disclosed JPMorgan's trade secrets. Del. Code. Ann. tit. 6, § 2001(2)(b). The complaint never alleges that defendants did *that* in Delaware.

There is one possible exception where a Delaware court has applied the Delaware Act to misappropriation outside the state: when the misappropriating acts were scattered all over the country. *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423, at *1 (Del. Super. Ct. Oct. 21, 1988). Because the misappropriation did not happen in a single identifiable place, the court applied the law of the state where the injury was felt, Delaware, as a fallback. *Id.* But JPMorgan does not allege a similar web of nationwide misappropriation that was not centered in any particular state. So an unusual need to look past where the misappropriation happened is not present here.

So I dismiss the Delaware Act claim. But I do so without prejudice. JPMorgan may amend its complaint to add a claim under a state law that reaches defendants' conduct or to allege facts to which the Delaware Act would apply.

## V. I Do Not Dismiss Verisk or TransUnion

JPMorgan has sued not only Argus but also its parent companies, Verisk (which owned Argus from 2012 to 2022) and TransUnion (which has owned it since). JPMorgan does not try to pierce the corporate veil. D.I. 23 at 3; D.I. 24 at 1. Instead, it alleges that Verisk and TransUnion directly took park in the misappropriation and so are directly liable. D.I. 23 at 3; D.I. 24 at 1.

### A. JPMorgan has plausibly alleged misappropriation by Verisk

Courts in the Third Circuit follow three steps to discern whether complaints plausibly state a claim: (1) note the elements of the plaintiff's cause of action; (2) cross out

any allegations that are "no more than conclusions"; then (3) take the remaining well-pleaded allegations, assume that they are true, and decide "whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The claim survives if, drawing all inferences in the plaintiff's favor, his allegations "nudge[ ] [his] claim[ ] across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Starting with the federal Act's elements, Verisk would be liable if it (1) used JPMorgan's trade secret while (2) knowing or having reason to know that it was "acquired under circumstances giving rise to a duty to maintain [its] secrecy … or limit [its] use." 18 U.S.C. §1839(5)(B)(ii)(II). The complaint alleges enough to make each element plausible.

First, there is use. The complaint alleges that "Argus shared the Trade Secret Data with Verisk for use in Verisk's other businesses, and Verisk used the Trade Secret Data for its own commercial purposes." Compl. ¶116. That broad accusation is conclusory, but a more precise allegation makes it plausible: a whistleblower who seemed to work for Verisk sent JPMorgan a letter warning that its "data assets have become Verisk's and its subsidiaries' assets/profits" and that "Verisk has encouraged and facilitated data sharing across [all its] subsidiaries." *Id.* ¶¶67–68. Accepting those allegations as true and reading them in the light most favorable to JPMorgan, Verisk plausibly used JPMorgan's data by sending it from Argus to other subsidiaries

so they could exploit it. *See Oakwood*, 999 F.3d at 909–10 (explaining the broad swath of activities that constitute using a trade secret).

Next, knowledge. JPMorgan recites that this element is met: "On information and belief, Verisk knew that Argus was misappropriating the Trade Secret Data." Compl. ¶¶ 100, 116. Once again, that statement is conclusory. But once again, the whistle-blower letter nudges it over the line of plausibility. The letter suggests that someone within Verisk knew it was using JPMorgan's trade secrets and that the use was improper—that is, that Verisk was breaking a duty to limit the data's use. *See* 18 U.S.C. § 1839(5)(B)(ii). In turn, that makes it plausible that relevant decisionmakers within Verisk knew or had reason to know that too.

To be sure, it takes several inferences to bridge the gap between what JPMorgan has alleged and what it would need to show at trial or summary judgment. But at this stage, the inferences are plausible, and the complaint need not contain "detailed factual allegations"—just enough to make Verisk's liability more than possible. *Iqbal*, 556 U.S. at 678. It has barely crossed that line.

### B. JPMorgan has plausibly alleged misappropriation by TransUnion

The allegations against TransUnion are also thin but enough. JPMorgan claims that in a 2022 meeting, "Argus and TransUnion admitted to the misappropriation of the Trade Secret Data that [JPMorgan] had provided to the Regulators." Compl. ¶ 86. This sentence could be read two ways: either that TransUnion admitted that the data were misappropriated (although not necessarily by it) or that it admitted to misappropriating the data itself. JPMorgan says it meant the latter. D.I. 67 at 37:19–22, 38:9–19. On a motion to dismiss, I must adopt that plausible reading and accept that

TransUnion was foolish enough to admit its guilt to the party who would sue it, as unlikely as that seems.

So for now, all defendants stay in the case.

\* \* \* \* \*

JPMorgan has stated a claim under the federal DTSA. But it has not alleged facts that would make defendants liable under Delaware's DUTSA, so I dismiss that claim with leave to amend. I decline to dismiss Verisk or TransUnion.