**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:24-cv-348-SB |
| ARGUS INFORMATION & ADVISORY SERVICES INC., VERISK ANALYTICS, INC. and TRANS UNION LLC, | ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANT VERISK ANALYTICS, INC.'S
<u>ANSWER TO PLAINTIFF'S COMPLAINT</u>**

Defendant Verisk Analytics, Inc. ("Verisk") hereby answers the Complaint filed by Plaintiff JPMorgan Chase Bank, National Association ("JPMC" or "Plaintiff"). Verisk denies the allegations in the Complaint except as specifically admitted, denies any allegation as to which there is no specific response, denies all titles, headings, subheadings, and any other material not contained in numbered paragraphs, including the introductory paragraph, and denies that it misappropriated in any way any trade secret purportedly owned by JPMC. On February 5, 2025, the Court issued a Memorandum Opinion (D.I. 76) and Order (D.I. 77) that dismissed Count Two of the Complaint (the "Dismissed Claim"). To the extent the Complaint contains allegations concerning the Dismissed Claim, no responsive pleading is required.

<u>**INTRODUCTION**</u>

1.      This action centers on an elaborate, decade-long scheme by Argus and its former and current parent companies to secretly misappropriate JPMC's valuable trade secret data

comprising anonymized monthly account and portfolio credit card data for tens of millions of credit card users.[1]

**ANSWER**: Denied.

2.      Argus obtained access to JPMC's trade secret information as a data aggregator for (a) the Office of the Comptroller of the Currency ("OCC") and (b) the Board of Governors of the Federal Reserve System ("Federal Reserve Board") and the Federal Reserve Bank of Philadelphia ("FRBP") (together, "Federal Reserve").[2]  Beyond this role, Argus had *no* right to use this data. In fact, Argus' contracts with the Regulators restricted Argus' ability to use, disclose, or distribute credit card data for commercial purposes.  But, for more than ten years, Argus covertly used, retained, and disclosed JPMC's trade secrets in Argus' commercial analytics business involving the nation's largest financial institutions.  Until alerted in mid-2022 by the Regulators, JPMC knew nothing of the scheme, which included the creation and use of customized software to surreptitiously mimic JPMC's trade secret data for Argus' commercial benefit.

**ANSWER**: Denied as stated. Verisk admits that Argus obtained access to information in the ordinary course as a data aggregator for the Regulators but denies that any such information constituted a trade secret or belonged to JPMC.  The allegations in the second and third sentences of paragraph 2 purport to state legal conclusions to which no response is required and, to the extent a response is required, they are denied.  Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth sentence of paragraph 2 relating to JPMC's knowledge and therefore denies them.  Verisk otherwise denies the allegations contained in paragraph 2.

---

[1]  This case does not involve any misuse or leakage of personally identifiable information ("PII").

[2]  The OCC and the Federal Reserve are referred to collectively herein as the "Regulators."

3.      When confronted by the Regulators, Argus admitted that (a) "certain data attributes derived from data that [was] provided to Argus by financial institutions pursuant to the Agreement [with the Regulators] were used by Argus personnel as an input into an industry scaling process that was used for another part of [Argus'] business" and (b) JPMC was "an institution whose anonymized data was inappropriately accessed or misused."

**ANSWER**: The allegations in paragraph 3 purport to quote from and characterize a document, and Verisk refers to that document as the best evidence of its complete and accurate contents. Verisk otherwise denies the allegations contained in paragraph 3.

4.      Based on this and related conduct, Argus recently agreed to pay $37 million to settle a civil investigation by the Department of Justice and other federal authorities. Emphasizing the criticality of protecting confidential data provided to banking regulators, the head of the Justice Department's Civil Division said this about the settlement: "Companies that do business with the federal government are expected to abide by the terms of their agreements, including any restrictions on the use or disclosure of government supplied data. We will not permit contractors to profit from the misuse of such data and to put the data at risk."

**ANSWER**: Verisk admits that Argus entered into a settlement agreement with the Department of Justice for $37 million.  The remainder of the allegations in paragraph 4 purport to quote from a document, and Verisk refers to that document as the best evidence of its complete and accurate contents.  Verisk otherwise denies the allegations contained in paragraph 4.

5.      Defendants indeed profited from their misuse of JPMC's trade secret data. JPMC accordingly brings this action to recover actual damages, including unjust enrichment, and exemplary damages caused by Defendants' willful and malicious misappropriation of JPMC's

trade secrets for their own financial benefit and enjoin Defendants from further unauthorized misuse of JPMC's trade secrets.

**ANSWER**: Denied.

## PARTIES

6.    JPMC is a bank organized under the laws of the United States with its main office in Columbus, Ohio.  JPMC is the consumer and commercial banking subsidiary of JPMorgan Chase & Co., a Delaware corporation and a U.S. banking and financial services company.  JPMC is one of the largest banks in the United States, serving customers worldwide with its deposit accounts, credit cards, mortgage loans, home equity, commercial banking, and investment services.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and therefore denies them.

7.    Before 2019, JPMC's credit card business was conducted through Chase Bank USA, N.A. ("Chase"), organized under the laws of the United States with its main office in Delaware. In 2019, Chase merged into JPMC.  At all relevant times, the core of JPMC's credit card business was and is conducted from Delaware.  Throughout this complaint, JPMC refers collectively to JPMC and Chase.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and therefore denies them.

8.    Argus is a corporation incorporated under the laws of Delaware with a principal place of business in White Plains, New York.  Argus describes itself as providing "benchmarking data, analytics, models, and advisory services" to help its customers "understand their world today."

**ANSWER**: Admitted.

4

9.      Verisk is a corporation incorporated under the laws of Delaware with a principal place of business in Jersey City, New Jersey. Verisk is a public company (Ticker Symbol: VRSK).  Verisk describes itself as "relied upon by leading financial institutions, payments providers, and retailers worldwide for competitive studies, predictive analytics, models, and advisory services to provide a clear perspective on where their business stands today."

**ANSWER**: Denied as stated. Verisk admits the allegations in the first and second sentences of paragraph 9.  Verisk denies the allegation in the third sentence of paragraph 9, which contains quoted language that does not describe Verisk; instead, it describes a business unit that was sold to TransUnion and whose leading business was Argus. The document that JPMC purports to quote and characterize is the best evidence of its complete and accurate contents.

10.      Verisk acquired Argus on August 31, 2012, for $425 million.  Verisk owned Argus for almost ten years, until April 7, 2022, when it sold Argus to TransUnion as part of a $515 million transaction.

**ANSWER**: Admitted.

11.      TransUnion is a limited liability company organized under the laws of Delaware with a principal place of business in Chicago, Illinois.  TransUnion is a wholly owned subsidiary of TransUnion Corporation, a Delaware corporation and public financial services company (Ticker Symbol: TRU). TransUnion describes itself as "a leading global information and insights company that makes trust possible between businesses and consumers, working to help people around the world access opportunities that can lead to a higher quality of life."

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 and therefore denies them.  The document that JPMC

purports to characterize and quote in the third sentence of paragraph 11 is the best evidence of its complete and accurate contents.

12.     As of April 8, 2022, TransUnion acquired from Verisk the equity interests of Argus and the other businesses comprising the former Verisk Financial Services reporting unit.  In February 2023, TransUnion stated its acquisition of Argus would allow it to "better serve [its] customers by providing enhanced insights and solutions" by combining Argus' "performance insights sourced from a consortium of financial institutions" with "TransUnion's authoritative datasets."

**ANSWER**: Verisk admits the allegations in the first sentence of paragraph 12.  The document that JPMC purports to characterize and quote in the second sentence of paragraph 12 is the best evidence of its complete and accurate contents.

## JURISDICTION AND VENUE

13.     This civil action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Delaware Uniform Trade Secrets Act, 6 *Del. C.* § 2001, *et seq.*

**ANSWER**: The allegations in paragraph 13 purport to state legal conclusions to which no response is required.

14.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and § 1332.

**ANSWER**: The allegations in paragraph 14 purport to state legal conclusions to which no response is required.

15.     This Court has personal jurisdiction over Defendants because each Defendant is incorporated under the laws of Delaware and, upon information and belief, Defendants sell their services and products in Delaware, to Delaware companies and citizens.  Defendants have

established minimum contacts within the forum such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

**ANSWER**: The allegations in paragraph 15 purport to state legal conclusions to which no response is required.

16.     Venue is proper under 28 U.S.C. § 1391(b)(1) because each Defendant resides in this district, and each Defendant is incorporated in Delaware.

**ANSWER**: The allegations in paragraph 16 purport to state legal conclusions to which no response is required.

## FACTUAL BACKGROUND

### A.    JPMC'S TRADE SECRET DATA

17.     JPMC is one of the largest credit card issuers in the United States.  JPMC estimates that in 2022 it was the number one U.S. credit card issuer based on sales and outstanding balances, with approximately 22% of the market based on credit card sales (excluding private label cards and commercial cards).

**ANSWER**: Denied as stated.  Verisk admits the allegations contained in the first sentence of paragraph 17.  Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 17, which relate to JPMC's own internal "estimates," and therefore denies them.

18.     JPMC maintains an extensive data compilation about its credit card business, including monthly detailed individual account-level data and compiled portfolio-level data that aggregates categories of accounts, as described herein.  JPMC's exclusive use and access to this data concerning its credit card business give it a significant competitive advantage.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 and therefore denies them.

19.    JPMC's compilation of monthly account and portfolio credit card data comprises JPMC's commercially valuable trade secret information at issue, i.e., the data described herein that JPMC provided to Argus as a data aggregator for the Regulators ("Trade Secret Data").

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 and therefore denies them.  Further, to the extent the allegations in paragraph 19 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

20.    JPMC's Trade Secret Data contains commercially valuable account data, including:

- Period ID

- State

- Loan Source/Channel

- Average Daily Balance

- Account Origination Date

- Refreshed Credit Bureau Score

- Current Credit Limit

- Line Increase or Decrease in the Current Month

- Minimum Payment Due

- Next Payment Due Date

- APR at Cycle End

- Cycles Past Due at Month End

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 and therefore denies them.  Further, to the extent paragraph 20 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

21.     JPMC's Trade Secret Data also contains commercially valuable portfolio data including:

- Period ID

- Total Number of New Accounts

- Managed Gross Charge-offs for the Current Month

- Managed Recoveries

- Interest and Fees Charged

- Loan Loss

- Interest Expense

- Non-Interest Expenses

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 and therefore denies them.  Further, to the extent paragraph 21 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

22.     As the Trade Secret Data is generated from the millions of credit cards JPMC has issued to consumers across the United States and the consumers' usage of those cards, JPMC is the creator, compiler, and owner of the Trade Secret Data.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and therefore denies them.  Further, to the extent the allegations in paragraph 22 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

23.     The Trade Secret Data is commercially valuable for many reasons.  The Trade Secret Data can provide detailed insights into JPMC's customer base and JPMC's business practices, including its rates and pricing.  The Trade Secret Data also derives independent

economic value because it provides JPMC with detailed account and portfolio information enabling JPMC to track, *inter alia*, market trends and existing and potential business growth.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegationsthe truth of the allegations in paragraph 23 and therefore denies them. Further, to the extent paragraph 23 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

24.     JPMC's Trade Secret Data is not generally known or readily ascertainable to third parties.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegationsthe truth of the allegations in paragraph 24 and therefore denies them. Further, to the extent paragraph 24 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

25.     JPMC does not sell its Trade Secret Data to third parties.  The Trade Secret Data cannot be properly acquired or duplicated by others.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegationsthe truth of the allegations in paragraph 25 and therefore denies them. Further, to the extent paragraph 25 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

26.     JPMC has taken reasonable and extensive efforts to keep its Trade Secret Data secret.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegationsthe truth of the allegations in paragraph 25 and therefore denies them.

Further, to the extent the allegations in paragraph 26 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

27.     JPMC has maintained and implemented numerous safeguards and security procedures to protect the Trade Secret Data.  JPMC has designated the Trade Secret Data at its highest confidentiality classification. JPMC also treats any Trade Secret Data it provides to its regulators as "Confidential Supervisory Information," meaning it is nonpublic information that is exempt from agency disclosure.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegationsthe truth of the allegations in paragraph 27 and therefore denies them. Further, to the extent paragraph 27 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

28.     Moreover, JPMC has maintained restrictions that limit the ability of employees to access particular servers and applications containing the Trade Secret Data.  Only employees specifically approved for access by designated approvers may access the password-protected servers or applications housing the Trade Secret Data.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies them.   Further, to the extent paragraph 28 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

29.     JPMC also has maintained and implemented policies and procedures designed to secure and protect its Trade Secret Data, including but not limited to technology controls that limit access to hardware and software.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies them. Further, to the extent paragraph 29 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

### B.    ARGUS MISAPPROPRIATES JPMC'S TRADE SECRET DATA AS A DATA AGGREGATOR FOR THE OCC

30.    As part of its oversight of regulated financial institutions, the OCC charters, regulates, and supervises all national banks and federal savings associations.

**ANSWER**: Admitted.

31.    Beginning in approximately 2009, the OCC mandated that certain banks, including JPMC, provide the OCC with anonymized domestic credit card data (*i.e.*, data without PII) in connection with its oversight of these entities.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies them.

32.    The OCC contracted with Argus as its data aggregator to process the banks' anonymized domestic credit card data on the OCC's behalf. The OCC's agreement with Argus restricted Argus' ability to use, disclose or distribute credit card data collected from banks for purposes other than as specified in the contract.

**ANSWER**: Denied as stated. Verisk admits the allegations in the first sentence of paragraph 32. The allegations in the second sentence of paragraph 32 purport to state legal conclusions to which no response is required, and, to the extent a response is required, they are denied. The allegations in paragraph 32 purport to characterize a contract, and Verisk refers to that contract as the best evidence of its complete and accurate contents.

33.     As a bank regulated by the OCC, in approximately 2009, JPMC began submitting the Trade Secret Data directly to Argus at the OCC's express direction.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33, which relate to directions JPMC received from the OCC, and therefore denies them.  Further, to the extent paragraph 33 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

34.     A specialized team of JPMC employees, all located in Delaware, assembled and prepared the Trade Secret Data and reviewed it to ensure the data was complete and excluded any consumer's PII. JPMC employees in Delaware then sent the encrypted Trade Secret Data to Argus, as the OCC's vendor, through a secure file transmission.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies them. Further, to the extent paragraph 34 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

35.     JPMC understood the Trade Secret Data it was required to provide to Argus as the OCC's data aggregator would remain confidential. Under federal law, trade secret information, such as the Trade Secret Data provided to the OCC, is exempt from disclosure under the Freedom of Information Act.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 that relate to JPMC's subjective "underst[andings]" and therefore denies them.  The remaining allegations in paragraph 35 purport to state legal conclusions to which no response is required, and, to the extent a response is required, they are denied.

36.     The OCC assured JPMC that the Trade Secret Data it provided to Argus would remain confidential. The OCC also confirmed to JPMC that it had contracted with Argus and received contractual confidentiality protections as well as confidentiality agreements from individuals at Argus who would have access to the Trade Secret Data.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore denies them.  Further, to the extent paragraph 36 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

37.     Distinct from the aggregator work it performed for federal banking regulators, Argus also has a lucrative commercial business that provides participating credit card issuers benchmarking reports that compare a credit card issuer's performance to other participating credit card issuers on an aggregated basis ("Benchmarking Studies").  To create these reports, Argus uses anonymized but extremely confidential credit card data that the participating credit card issuers share with Argus.  Argus also offers participating card issuers separate analytics and modeling services ("Related Services") that rely on at least some of the same data used in the Benchmarking Studies.

**ANSWER**: Verisk admits that Argus has a commercial business that provides participating credit card issuers benchmarking reports that compare a credit card issuer's performance to other participating credit card issuers on an aggregated basis; that to create these reports, Argus uses anonymized credit card data that the participating credit card issuers share with Argus; and that Argus also offers participating card issuers analytics and modeling services that rely on at least some of the same data used to create the benchmarking reports; but otherwise denies that the

allegations of paragraph 37 provide a complete and/or accurate description of Argus's businesses or processes.

38.     Participating card issuers use the Benchmarking Studies and Related Services to better understand the competitive landscape and improve their own marketing, performance, profitability, and risk management activities.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 that relate to why card issuers subjectively use Argus's products and therefore denies them.

39.     Before 2010, virtually every major credit card issuer, including JPMC, participated in the Benchmarking Studies.

**ANSWER**: Denied as stated. Verisk admits that, before 2010, JPMC and other credit card issuers participated in the Benchmarking Studies, but lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "virtually every major credit card issuer" participated.

40.     Effective November 2010, JPMC withdrew from the Benchmarking Studies and discontinued its relationship with Argus.

**ANSWER**: Denied as stated.  Verisk admits that, effective November 2010, JPMC withdrew from Argus's Benchmarking Studies, but denies that JPMC discontinued its relationship with Argus.

41.     At the time, JPMC was one of the top five credit card issuers in the United States, and it accounted for almost 20% of the credit card market by the amount of sales and the balances outstanding on customer accounts.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and therefore denies them.

42.    On information and belief, JPMC's decision to exit the Benchmarking Studies was a major loss for Argus and its highly profitable data analytics business.  With JPMC no longer contributing its data, the Benchmarking Studies and Related Services would lose significant value to Argus and the other participating credit card issuers.  Further, Argus faced significant risk that other bank participants would find the Benchmarking Studies and Related Services not worth the substantial fees they paid to Argus.  The ongoing viability of Argus' subscription-based business model was in jeopardy, and a critical piece of Argus' business was at risk of collapse.

**ANSWER**: Denied.

43.    Accordingly, Argus secretly devised a willful and malicious scheme to misappropriate the Trade Secret Data and protect the value of its franchise at JPMC's expense.

**ANSWER**: Denied.  Further, to the extent paragraph 43 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

44.    Although JPMC was no longer participating in the Benchmarking Studies, Argus still had access to the Trade Secret Data it continued to receive on a monthly basis as the OCC's data aggregator, which provided Argus with the opportunity to misappropriate the Trade Secret Data.

**ANSWER**:  Denied as stated.  Verisk admits that Argus, in its capacity as aggregator for the OCC and while its contract with the OCC was effective, received data from JPMC on a monthly basis.  Verisk otherwise denies the remaining allegations in paragraph 44. Further, to the extent

paragraph 44 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

45.    Unbeknownst to JPMC, Argus willfully, maliciously, and improperly accessed, used, and retained the Trade Secret Data to fill the gap of losing JPMC's data for its Benchmarking Studies and Related Services—even though it knew JPMC owned the Trade Secret Data and considered it highly valuable, confidential, and proprietary.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 that relate to JPMC's subjective knowledge and how JPMC considered data and therefore denies them.  Verisk otherwise denies the remaining allegations in paragraph 45.  Further, to the extent the remaining allegations in paragraph 45 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

46.    On information and belief, Argus wanted to ensure it could still represent that its Benchmarking Studies and Related Services included a significant percentage of the credit card industry to showcase the quality and quantity of data it maintained before JPMC's departure.  By misappropriating the Trade Secret Data, Argus continued the Benchmarking Studies without interruption.

**ANSWER**: Verisk denies the allegations in the first sentence of paragraph 46. The allegations in the second sentence of paragraph 46 purport to state legal conclusions to which no response is required, and, to the extent a response is required, they are denied.

47.    Unbeknownst to JPMC, Argus developed a sophisticated computer program it periodically updated that unlawfully accessed, used, and retained JPMC's Trade Secret Data to mimic that data for use and disclosure in the Benchmark Studies and Related Services Argus sold credit card issuers.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 that relate to JPMC's subjective knowledge and therefore denies them. Verisk otherwise denies the remaining allegations in paragraph 47. Further, to the extent the remaining allegations in paragraph 47 purport to state legal conclusions, no response is required.

48.    On information and belief, Argus' management authorized and approved the creation of the secret specialized computer program and the misappropriation of JPMC's Trade Secret Data, and, after Verisk acquired Argus, Verisk's management knew and authorized the ongoing misappropriation of the Trade Secret Data.

**ANSWER**: Denied. Further, to the extent paragraph 48 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

49.    Argus covertly and unlawfully accessed, used, retained, and disclosed the misappropriated Trade Secret Data in its national operations and sent results of the Benchmarking Studies and Related Services incorporating the Trade Secret Data to other credit card issuers, including to credit card issuers in Delaware.

**ANSWER**: Denied. Further, to the extent paragraph 49 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

50.    After JPMC withdrew from the Benchmarking Studies in 2010, Argus never sought or obtained permission from JPMC to access, use, retain, or disclose the Trade Secret Data for the Benchmarking Studies or for any other of Argus' commercial services.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 that relate to any permissions sought or obtained from JPMC and therefore denies them. Further, to the extent paragraph 50 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

51.    The unauthorized retrieval, use, retention, and disclosure of the Trade Secret Data was a systematic effort by Argus to willfully and maliciously misappropriate that data for its own commercial benefit to unjustly enrich itself.

**ANSWER**: Denied. Further, to the extent paragraph 51 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

### C.    ARGUS CONTINUES TO MISAPPROPRIATE THE TRADE SECRET DATA AS THE FEDERAL RESERVE'S DATA AGGREGATOR

52.    The Federal Reserve also required bank holding companies and intermediate holding companies to provide anonymized credit card data for regulatory oversight.

**ANSWER**: Admitted.

53.    By June 2012, the Federal Reserve Board had retained Argus as its data aggregator and directed JPMC to provide anonymized credit card data to Argus.

**ANSWER**: Denied as stated. Verisk admits that the Federal Reserve Board retained Argus in March 2012 and that JPMC provided anonymized credit card data to Argus in Argus's capacity as the Federal Reserve Board's data aggregator. Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 that relate to any directions given by the Federal Reserve Board to JPMC and therefore denies them.

54.     On behalf of the Federal Reserve Board, the FRBP separately retained Argus as a data aggregator and directed JPMC to provide anonymized credit card data to Argus.

**ANSWER**: Verisk admits that the Federal Reserve Board delegates responsibilities to the FRBP and that, acting to fulfill certain responsibilities delegated to it by the Federal Reserve Board, the FRBP retained Argus as a data aggregator and directed JPMC to provide anonymized credit card data to Argus in Argus's capacity as the FRBP's data aggregator.

55.     Argus' contracts with the Federal Reserve provided that Argus (a) would access and use the data for the sole purpose of performing the services to be provided under the contract or as otherwise instructed in writing by the Federal Reserve and (b) would not use or exploit data submitted under the contract for its own benefit.

**ANSWER**: The allegations in paragraph 55 purport to state legal conclusions to which no response is required and, to the extent a response is required, they are denied.  The allegations in paragraph 55 purport to characterize a contract, and Verisk refers to that contract as the best evidence of its complete and accurate contents.

56.     In compliance with the Federal Reserve's requirements, JPMC provided its Trade Secret Data to Argus.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56, which relate to purported requirements given by the Federal Reserve Board to JPMC, and therefore denies them.  Further, to the extent paragraph 56 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

57.     JPMC reasonably believed that the Trade Secret Data it provided to Argus would be kept confidential and not misappropriated. Under federal law, trade secret information, such as

the Trade Secret Data provided to the Federal Reserve, is exempt from disclosure under the Freedom of Information Act.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 57, which relate to JPMC's subjective "belie[fs]" and whether they were "reasonable," and therefore denies them.  The allegations in the second sentence of paragraph 57 purport to state legal conclusions to which no response is required and, to the extent a response is required, they are denied.  Further, to the extent paragraph 57 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

58.    Under instructions from the Regulators, JPMC continued to provide Argus with the Trade Secret Data through the expiration of the Federal Reserve's agreements with Argus on July 31, 2022.  JPMC personnel in Delaware sent all such de-personalized and encrypted data to Argus through a secure file transmission.

**ANSWER**: Denied as stated. Verisk admits that JPMC provided Argus with data through the expiration of the Federal Reserve's agreements with Argus on July 31, 2022.  Verisk otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 58 and therefore denies them.  Further, to the extent paragraph 58 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

59.    When it negotiated and signed its agreements with the Federal Reserve, Argus was already running its secret computer program using the misappropriated Trade Secret Data JPMC had provided to Argus, as the OCC's data aggregator.

**ANSWER**: Denied.  Further, to the extent paragraph 59 purports to state a legal conclusion as to the defined term "Trade Secret Data," no response is required, and, to the extent a response is required, Verisk denies it.

60.    Argus continued to wrongfully conceal its misappropriation from JPMC. Argus knew JPMC owned the Trade Secret Data it provided per the Regulators' direction. Argus never sought or obtained written permission from JPMC to acquire, use, or disclose the Trade Secret Data for the Benchmarking Studies or any Related Services.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 that relate to any permissions sought or obtained from JPMC and therefore denies them.  Verisk denies the remaining allegations in paragraph 60. Further, to the extent the remaining allegations in paragraph 60 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

61.    As discussed, on information and belief, Argus misappropriated JPMC's Trade Secret Data to ensure it could maintain the value of its businesses, continue to market its services as including a significant percentage of the credit card industry, and maintain the quality and quantity of data it had before JPMC's departure.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 61 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

62.    Indeed, and on information and belief, by willfully and maliciously misappropriating the Trade Secret Data, Argus was able to retain its existing customers of its Benchmarking Studies and Related Services and obtain new customers for the same, unjustly reaping enormous commercial and financial benefits for itself and its affiliates.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 62 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

### D.     ARGUS ADMITS IT MISAPPROPRIATED JPMC'S TRADE SECRET DATA

63.     In or around September 2020, the federal government alerted Argus and Verisk to a Department of Justice investigation concerning Argus' data misappropriation.

**ANSWER**: Verisk admits that, in or around September 2020, the federal government alerted Argus and Verisk to an investigation concerning Argus's use of certain data.

64.     In December 2020, the Federal Reserve received written notice from Argus advising that "certain data attributes derived from data that is provided to Argus by financial institutions pursuant to the Agreement [with the Federal Reserve] were used by Argus personnel as an input into an industry scaling process that was used for another part of our business."

**ANSWER**: Paragraph 64 purports to quote from and characterize a document, and that document is the best evidence of its complete and accurate contents.  Verisk otherwise denies that the allegations in paragraph 64 present a complete or accurate description of the referenced letter or surrounding circumstances and events.

65.     The letter failed to identify what other parts of Argus or Verisk's businesses improperly accessed, retained, used, or disclosed the data provided to the Federal Reserve.

**ANSWER**: Paragraph 65 purports to quote from and characterize a document, and that document is the best evidence of its complete and accurate contents.  Verisk otherwise denies that the allegations in paragraph 65 present a complete or accurate description of the referenced letter or surrounding circumstances and events.

66.     Argus and Verisk also failed to notify JPMC that they were improperly acquiring, using, and disclosing the Trade Secret Data for other parts of their businesses, and Argus and Verisk continued to misappropriate the data.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 66 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

### E.     JPMC RECEIVES A WHISTLEBLOWER LETTER, AND ARGUS AND VERISK WILLFULLY AND MALICIOUSLY MISLEAD JPMC

67.     In April 2021, JPMC received an unsigned whistleblower letter alleging that Argus and its parent Verisk were improperly disclosing JPMC credit card data to other Verisk subsidiaries. On information and belief, the whistleblower was a Verisk employee.

**ANSWER**: Verisk admits that JPMC received an anonymous letter, but denies JPMC's characterization of the document, including that it alleged that Verisk was disclosing JPMC credit card data to Verisk subsidiaries.  The document that JPMC purports to characterize is the best evidence of its complete and accurate contents. Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 67 that relate to whether the letter's author was a Verisk employee, and therefore denies them.

68.     According to the whistleblower, Verisk's knowledge and involvement in this scheme was pervasive:

A.     "Your company/bank has contributed your data to ARGUS Information over years."

B.     "Argus Information is part of Verisk Group."

C.     "Verisk has encouraged and facilitated data sharing across its all [sic] subsidiaries."

D.     "ARGUS (banking) gathers all credit card data and share [sic] with Verisk [sic] other subsidiaries."

E.      "Your data assets have become Verisk's and its subsidiaries' assets/profits over years: your data have been developed to various products and sold to a number of their clients in a number of industries."

**ANSWER**: Verisk admits that JPMC received an anonymous letter and refers to that letter as the best evidence of its complete and accurate contents.

69.     JPMC provided a copy of the whistleblower letter to Argus and requested that it confirm Argus was properly handling JPMC's valuable data.

**ANSWER**: Verisk admits that, approximately two months after JPMC received the anonymous letter, JPMC provided a copy of it to Argus and requested that Argus confirm it was in compliance with certain contractual obligations to JPMC that did not relate to the purported trade secret that JPMC alleges was misappropriated. The communication that JPMC purports to characterize is the best evidence of its complete and accurate contents. Verisk otherwise denies the allegations in paragraph 69.

70.     On June 23, 2021, Argus provided a written response to JPMC personnel in Delaware to address the concerns raised in the whistleblower letter.  Verisk and its internal counsel reviewed and approved the response letter before Argus sent it to JPMC.

**ANSWER**: Verisk admits that, on June 23, 2021, Argus provided a written response to JPMC after JPMC provided a copy of the anonymous letter to Argus and that internal counsel at Verisk reviewed the response letter before Argus sent it to JPMC.  The communication that JPMC purports to characterize is the best evidence of its complete and accurate contents.  Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 70 that relate to whether JPMC personnel were located in Delaware and therefore denies them.  Otherwise, Verisk denies the allegations in paragraph 70.

71.     In its response, Argus acknowledged receipt of the whistleblower letter and represented that it had conducted an audit and confirmed compliance with its obligations to JPMC. The Argus letter was signed by Argus' Head of Data Compliance and was copied to an Argus Senior Managing Director as well as Argus' General Counsel. Argus' response gave the impression that Argus had taken seriously the allegations and JPMC's concerns.

**ANSWER**: Paragraph 71 purports to characterize a communication, which is the best evidence of its complete and accurate contents. Verisk denies that the allegations in paragraph 71 present a complete or accurate summary of the referenced document. Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 that relate to JPMC's subjective "impression[s]" and therefore denies them.

72.     Argus' June 23, 2021 response letter was an intentional effort to conceal its ongoing willful and malicious misappropriation and prevent JPMC from discovering Argus' unlawful conduct. Argus' response letter was purposely misleading in several respects.

**ANSWER**: Denied. Further, to the extent the allegations in paragraph 72 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

73.     First, Argus provided assurances to JPMC that were misleading because Argus and Verisk were then aware for more than nine months of the ongoing Department of Justice investigation and knew of their improper acquisition, use, and disclosure of the Trade Secret Data. Argus had already admitted to the Federal Reserve that Argus had misappropriated the Trade Secret Data. Indeed, Argus disclosed to JPMC that Argus had conducted an audit without also disclosing that it had determined, and already reported to a federal regulator, that Argus had misappropriated the Trade Secret Data collected pursuant to Argus' services for the Regulators for other parts of Argus' business.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 73 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

74.     Second, in an ongoing effort to conceal its long-standing misconduct from JPMC, Argus provided false assurances by misleadingly defining "JPMC's Data" to include only the data JPMC had provided Argus for Benchmarking Studies**,** knowing that Argus had for more than a decade willfully and maliciously misappropriated the Trade Secret Data it obtained in its role as a data aggregator for the Regulators on a massive scale.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 74 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

75.     Third, Argus intentionally misled JPMC into believing Argus had thoroughly investigated the whistleblower's allegations and determined that none of JPMC's Trade Secret Data had been misappropriated.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 75 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

76.     As of April 8, 2022, TransUnion acquired the equity interests of Argus and several other businesses Verisk had owned in its Verisk Financial Services unit.

**ANSWER**: Admitted.

77.     Before closing the transaction, TransUnion learned from Verisk of Argus' misappropriation of data provided to it as a data aggregator for the Regulators. After the transaction closed, TransUnion failed to notify JPMC of Argus' conduct.

**ANSWER**: Verisk admits that, before closing the transaction, TransUnion learned from Verisk that the Department of Justice was investigating Argus. Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of

paragraph 77 and therefore denies them.   Further, to the extent the allegations in paragraph 77 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

78.     After the acquisition, TransUnion exclusively controlled Argus. TransUnion installed its senior personnel as Argus' CEO and other senior management positions.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 and therefore denies them.

79.     As part of Argus' Related Services rendered both before and after it became part of TransUnion, Argus marketed, developed, and created a variety of complex financial models for use by its customers, and Defendants earned substantial income from such modeling services. On information and belief, Argus misused and disclosed the Trade Secret Data in dozens of models it developed for its customers' ongoing use.

**ANSWER**: Verisk admits that "before . . . [Argus] became part of TransUnion, Argus marketed, developed, and created a variety of complex financial models for use by its customers" but lacks knowledge or information sufficient to form a belief as to whether that continued after Argus became part of TransUnion and therefore denies them. Verisk otherwise denies the remaining allegations in paragraph 79.  Further, to the extent the allegations in paragraph 79 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

80.     Argus, Verisk, and TransUnion know that Argus built models with the Trade Secret Data. On information and belief, Argus and TransUnion also know several of these improper Argus-created models remain in use by JPMC's competitors.  Also, on information and belief,

Argus and TransUnion have failed to prevent all such models from continuing to be used or accessed by their customers or otherwise recover the models.

**ANSWER**: Denied. Further, to the extent the allegations in paragraph 80 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

81.    TransUnion continued to misappropriate the Trade Secret Data to enhance its and Argus' businesses.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 81 and therefore denies them. Further, to the extent the allegations in paragraph 81 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

### G.    THE DEPARTMENT OF JUSTICE INVESTIGATES ARGUS' MISUSE OF CREDIT CARD DATA

82.    On or about July 26, 2022, TransUnion publicly acknowledged that the Department of Justice was investigating whether Argus misused data it had collected under certain government contracts, and such alleged misuse commenced before TransUnion acquired Argus.

**ANSWER**: The allegations in paragraph 82 purport to summarize a document, and Verisk refers to that document as the best evidence of its complete and accurate contents.

83.    JPMC first learned of Argus' misappropriation when the Federal Reserve provided written notice dated May 31, 2022, to JPMC that Argus had misused the Trade Secret Data that was collected pursuant to Argus' contracts with the Federal Reserve.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 and therefore denies them. Further, to the extent the allegations in paragraph 83 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

84.    Also on May 31, 2022, the OCC provided JPMC with written notice that Argus misused the Trade Secret Data collected pursuant to Argus' contracts with the OCC. The OCC quoted from Argus' December 2020 written notice, which stated in part, that "certain data attributes derived from data that is provided to Argus by financial institutions pursuant to the Agreement were used by Argus personnel as an input into an industry scaling process that was used for another part of [Argus'] business." The OCC's notice also identified JPMC's Trade Secret Data as among the data that Argus misused.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and therefore denies them.  The allegations in paragraph 84 purport to quote from and summarize certain documents, and Verisk refers to those documents for a complete and accurate record of their contents.  Further, to the extent the allegations in paragraph 84 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

85.    In June 2022, JPMC demanded in writing information from Argus and TransUnion concerning the misappropriation of the Trade Secret Data.

**ANSWER**: Verisk admits that, in June 2022, JPMC wrote to Argus and TransUnion and refers to the referenced document for a complete and accurate summary of its contents.  Verisk otherwise denies the allegations in paragraph 85.  Further, to the extent the allegations in paragraph 85 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

86.    In July 2022, Argus and TransUnion met with JPMC. Argus and TransUnion admitted to the misappropriation of the Trade Secret Data that JPMC had provided to the Regulators since 2010.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and therefore denies them. Further, to the extent the allegations in paragraph 86 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

87.     After learning of Argus' misappropriation of the Trade Secret Data, JPMC tried to determine which Verisk businesses accessed and misused the data and what products and services Verisk and Argus had developed and sold in connection with Argus' improper retrieval, use, retention and disclosure of the data. But Verisk declined to participate in any discussions with JPMC regarding the misappropriation of the Trade Secret Data. Verisk has not publicly denied or otherwise disputed that Verisk used the Trade Secret Data in Verisk's other businesses and for its own commercial purposes.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 that relate to JPMC's "learning" or efforts, and therefore denies them. Otherwise, Verisk denies that the allegations in paragraph 87, which do not present a complete or accurate summary of the circumstances or events discussed. Further, to the extent the allegations in paragraph 87 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

### H.     ARGUS PAYS $37 MILLION DOLLARS TO SETTLE THE DEPARTMENT OF JUSTICE INVESTIGATION

88.     On March 13, 2024, the Department of Justice announced Argus "agreed to pay the United States $37 million to resolve claims under the False Claims Act and the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), in connection with its access to and use of credit card data obtained pursuant to contracts with various federal regulators, including the Office of the Comptroller of the Currency (OCC), the Board of Governors of the

Federal Reserve System (FRB) and the Consumer Financial Protection Bureau (CFPB)." Copies of the settlement and related Department of Justice Press Release are attached as Exhibits A and B, respectively.

**ANSWER**: Verisk admits that, on March 13, 2024, the Department of Justice issued a statement with the language quoted in paragraph 88 and refers to that statement as the best evidence of its complete and accurate contents.

89.    According to the Department of Justice, the settlement "resolves allegations that, from 2010 through 2020, Argus improperly accessed, used and retained anonymized credit card data that it received under the contracts. The United States alleged that Argus used this anonymized data to create synthetic (proxy) data that it incorporated into the products and services it sold to some commercial customers in place of actual data from certain banks. The United States further alleged that Argus failed to disclose its improper access, use and retention of credit card data to the United States and the extent to which it relied on synthetic data to its commercial clients."

**ANSWER**: Verisk admits that the Department of Justice issued a press release with the language quoted in paragraph 89 and refers to that statement as the best evidence of its complete and accurate contents.

90.    Commenting on the settlement, one Department of Justice official stated: "We will hold companies accountable when they breach their agreements with regulators and misuse sensitive data for their own commercial gain."

**ANSWER**: Verisk admits that the Department of Justice issued a press release with the language quoted in paragraph 90 and refers to that statement as the best evidence of its complete and accurate contents.

## **COUNT ONE**

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.)**

**[Against All Defendants]**

91.    All previous paragraphs are incorporated herein as if fully set forth.

**ANSWER**: To the extent a response is required, Verisk re-alleges and incorporates the responses set forth in the preceding paragraphs as if set forth fully herein.

92.    Defendants have misappropriated the Trade Secret Data JPMC provided to Argus as a data aggregator for the Regulators.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 92 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

93.    JPMC owns the Trade Secret Data.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 93 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

94.    The Trade Secret Data was used in interstate and/or foreign commerce.

**ANSWER**: The allegations in paragraph 94 state legal conclusions to which no response is required and, to the extent a response is required, Verisk lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 94.

95.    By, among other things, storing the Trade Secret Data on secure servers, keeping them password protected, providing access to the Trade Secret Data to only select employees with a business need to view them, and sharing the data only with third parties who signed nondisclosure agreements to use the data for solely limited business purposes, JPMC has taken reasonable measures to keep its data secret.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 95 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

96.    The Trade Secret Data is immensely valuable, as it provides detailed insights into, *inter alia*, JPMC's credit card practices, policies, and growth, based on JPMC's customers' spending habits, payment histories, engagement in rewards programs, and special JPMC offers.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 96 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

97.    The Trade Secret Data derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the data. The Trade Secret Data provides detailed insights into JPMC's customer base and JPMC's business practices that are confidential and not publicly known or ascertainable.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 97 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

98.    Defendants unlawfully accessed, used, retained, and disclosed the Trade Secret Data. The Regulators mandated JPMC to provide the data to Argus as a federally sanctioned data aggregator, and Argus was forbidden from using the Trade Secret Data or disclosing the Trade Secret Data for other purposes.

**ANSWER**: Verisk admits that JPMC provided data to Argus, in its capacity as aggregator for the Regulators.  Verisk otherwise denies the allegations contained in paragraph 98. Further, to the extent the allegations in paragraph 98 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

99.    Defendants willfully and maliciously misappropriated the Trade Secret Data by breaching its duty to maintain its secrecy and accessing, using, retaining, and disclosing it in the Benchmarking Studies and Related Services.

**ANSWER**: Denied.  Further, to the extent the allegations in paragraph 99 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

100.    On information and belief, Argus shared the Trade Secret Data with Verisk for use in Verisk's other businesses, and Verisk used the Trade Secret Data for its own commercial purposes.  Indeed, around 2018, Verisk retained Argus' Chief Information Officer to serve in the same role at Verisk.  On information and belief, Verisk knew that Argus was misappropriating the Trade Secret Data.

**ANSWER**: Verisk admits that it hired Argus's Chief Information Officer to serve in the same role at Verisk.  Otherwise, Verisk denies the allegations contained in paragraph 100.  Further, to the extent the allegations in paragraph 100 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

101.    In its public filings, TransUnion stated the Argus acquisition enhanced TransUnion's business and services to its customers by combining its existing "authoritative datasets" with Argus' "performance insights sourced from a consortium of financial institutions." On information and belief, Argus shared its insights sourced from the Trade Secret Data with TransUnion for use in TransUnion's businesses, and TransUnion used the Trade Secret Data for its own commercial purposes.

**ANSWER**: Verisk admits that TransUnion made public statements with the language quoted in the first sentence of paragraph 101. Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 101 and therefore denies them.  Further, to the extent the allegations in paragraph 101 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

102.    Argus used and disclosed the Trade Secret Data in numerous models it created, developed, and marketed for its customers' ongoing use.  On information and belief, several Argus-created models remain in use by Argus' customers who are JPMC's competitors. Defendants knew that those models were built using misappropriated Trade Secret Data.

**ANSWER**: Denied. Further, to the extent the allegations in paragraph 102 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

103.    Upon information and belief, Defendants earned revenue from their customers on such models.  Moreover, Argus and TransUnion have not taken steps to (a) prevent all such models from continuing to be used or accessed by their customers, (b) modify the models to remove all aspects of the models that were built using the Trade Secret Data, and/or (c) otherwise recover all models that were built using the Trade Secret Data.

**ANSWER**: Verisk admits that Argus may earn revenue for models it provides to customers, but otherwise denies the allegations in the first sentence of paragraph 103.  Verisk otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 103 and therefore denies them. Further, to the extent the allegations in paragraph 103 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

104.    JPMC never consented to Defendants' unlawful retrieval, use, retention, or disclosure of the Trade Secret Data it provided to Argus.

**ANSWER**: Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore denies them.  Further, to the extent the allegations in paragraph 104 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

105.    Defendants' willful and malicious trade secret misappropriation damaged JPMC and unjustly enriched Defendants.  Argus knowingly and continuously used and disclosed the Trade Secret Data to enhance the Benchmarking Studies and Related Services and to continue to profit from them, all of which it sold to its customers (at least some of whom are JPMC's direct competitors) who were or became customers of the Benchmarking Studies and Related Services. Upon information and belief, Verisk also used or disclosed the Trade Secret Data for one or more of its other businesses. Further, TransUnion was also unjustly enriched by its use of the Trade Secret Data in its other businesses.

**ANSWER**: Denied. Further, to the extent the allegations in paragraph 105 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

106.    Due to Defendants' willful and malicious conduct, JPMC is entitled to damages including but not limited to lost profits, unjust enrichment, a reasonable royalty, and attorney's fees and costs, as well as an injunction against Defendants for any ongoing improper conduct.

**ANSWER**: Verisk denies that it engaged in any willful and malicious conduct.  Verisk lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph relating to the state of mind of any other party and therefore denies them.  Further, the allegations in paragraph 106 purport to state legal conclusions to which no response is required and, to the extent a response is required, they are denied.

107.    By, *inter alia*, willfully and maliciously misappropriating the Trade Secret Data, secretly developing and deploying a specialized and sophisticated computer program to leverage the data for its own commercial purposes, revising and enhancing that computer program over time to improve its ability to misuse the Trade Secret Data for its own commercial purposes, taking steps to use and share the Trade Secret Data, and taking steps to prevent JPMC from learning of Defendants'

improper conduct, Defendants' trade secret misappropriation was willful and malicious, and JPMC is entitled to exemplary damages in addition to compensatory damages.

**ANSWER**: Denied. Further, to the extent the allegations in paragraph 107 purport to state legal conclusions, no response is required, and, to the extent a response is required, they are denied.

## COUNT TWO

### (Violation of the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, et seq.)

### [Against All Defendants]

108.    All previous paragraphs are incorporated herein as if fully set forth.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

109.    Defendants have misappropriated the Trade Secret Data JPMC provided to Argus as a data aggregator for the Regulators.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

110.    JPMC owns the Trade Secret Data.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

111.    By, among other things, storing the Trade Secret Data on secure servers, keeping them password protected, providing access to the Trade Secret Data to only select employees with a business need to view them, and sharing the data only with third parties who signed non-disclosure agreements to use the data for solely limited business purposes, JPMC has taken reasonable measures to keep its data secret.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

112.    The Trade Secret Data is immensely valuable, as it provides detailed insights into, *inter alia*, JPMC's credit card practices, policies, and growth, based on JPMC's customers' spending habits, payment histories, engagement in rewards programs, and special JPMC offers.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

113.    The Trade Secret Data derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the data. The Trade Secret Data provides detailed insights into JPMC's customer base and JPMC's business practices that are confidential and not publicly known or ascertainable.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

114.    Defendants unlawfully accessed, used, retained, and disclosed the Trade Secret Data. The Regulators mandated JPMC to provide the data to Argus as a federally sanctioned data aggregator, and Argus was forbidden from using the Trade Secret Data or disclosing the Trade Secret Data for other purposes.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

115.    Defendants willfully and maliciously misappropriated the Trade Secret Data by breaching its duty to maintain its secrecy and accessing, using, retaining, and disclosing it in the Benchmarking Studies and Related Services.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

116.    On information and belief, Argus shared the Trade Secret Data with Verisk for use in Verisk's other businesses, and Verisk used the Trade Secret Data for its own commercial purposes. Indeed, around 2018, Verisk retained Argus' Chief Information Officer to serve in the same role at Verisk. On information and belief, Verisk knew that Argus was misappropriating the Trade Secret Data.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

117.    In its public filings, TransUnion stated the Argus acquisition enhanced TransUnion's business and services to its customers by combining its existing "authoritative

datasets" with Argus' "performance insights sourced from a consortium of financial institutions." On information and belief, Argus shared its insights sourced from the Trade Secret Data with TransUnion for use in TransUnion's businesses, and TransUnion used the Trade Secret Data for its own commercial purposes.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

118.    Argus used and disclosed the Trade Secret Data in numerous models it created, developed, and marketed for its customers' ongoing use. On information and belief, several Argus-created models remain in use by Argus' customers who are JPMC's competitors. Defendants knew that those models were built using misappropriated Trade Secret Data.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

119.    Upon information and belief, Defendants earned revenue from their customers on such models. Moreover, Argus and TransUnion have not taken steps to (a) prevent all such models from continuing to be used or accessed by their customers, (b) modify the models to remove all aspects of the models that were built using the Trade Secret Data, and/or (c) otherwise recover all models that were built using the Trade Secret Data.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

120.    JPMC never consented to Defendants' unlawful retrieval, use, retention, or disclosure of the Trade Secret Data it provided to Argus.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

121.    Defendants' willful and malicious trade secret misappropriation damaged JPMC and unjustly enriched Defendants. Argus knowingly and continuously used and disclosed the Trade Secret Data to enhance the Benchmarking Studies and Related Services and to continue to profit from them, all of which it sold to its customers (at least some of whom are JPMC's direct

competitors) who were or became customers of the Benchmarking Studies and Related Services. Upon information and belief, Verisk also used or disclosed the Trade Secret Data for one or more of its other businesses. Further, TransUnion was also unjustly enriched by its use of the Trade Secret Data in its other businesses.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

122.    Due to Defendants' willful and malicious conduct, JPMC is entitled to damages including but not limited to lost profits, unjust enrichment, a reasonable royalty, and attorney's fees and costs, as well as an injunction against Defendants for any ongoing improper conduct.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

123.    By, *inter alia*, willfully and maliciously misappropriating the Trade Secret Data, secretly developing and deploying a specialized and sophisticated computer program to leverage the data for its own commercial purposes, revising and enhancing that computer program over time to improve its ability to misuse the Trade Secret Data for its own commercial purposes, taking steps to use and share the Trade Secret Data, and taking steps to prevent JPMC from learning of Defendants' improper conduct, Defendants' trade secret misappropriation was willful and malicious, and JPMC is entitled to exemplary damages in addition to compensatory damages.

**ANSWER**: Count two has been dismissed, and therefore no response is needed.

## DEMAND FOR JURY

JPMC respectfully demands a trial by jury for all causes of action.

**ANSWER**: No response is required.

## PRAYER FOR RELIEF

WHEREFORE, JPMC prays that the Court enter judgment as follows:

A.    Enjoin Defendants from improperly acquiring, using, or otherwise disclosing JPMC's Trade Secret Data;

B.      Award JPMC damages adequate to compensate for Defendants' misappropriation of JPMC's Trade Secret Data including, but not limited to, lost profits, unjust enrichment, and a reasonable royalty as a result of the misappropriations;

C.      Award exemplary damages to JPMC owing to the willful and malicious nature of Defendants' trade secret misappropriation acts up to the statutory maximum;

D.      Award JPMC an accounting for Defendants' wrongful acts;

E.      Award JPMC its reasonable attorneys' fees and costs, as well as prejudgment interest and post-judgment interest on its damages, attorneys' fees, and costs;

F.      Award JPMC such equitable relief which may be requested and to which JPMC is entitled; and

G.      Award JPMC any other and further relief as this Court deems just and proper.

**ANSWER**: Verisk  denies that JPMC is entitled to a judgment and/or any relief requested in the Prayer for Relief set forth in the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Verisk raises the following defenses and affirmative defenses without waiver of any others that may be available to it. Verisk specifically reserves the right to raise any additional defenses and affirmative defenses at any time during the pendency of these proceedings, including any and all which may come to light through discovery or otherwise. In alleging these defenses and affirmative defenses, Verisk does not assume any burden of proof, persuasion, or production not otherwise legally assigned it.

### FIRST DEFENSE

Plaintiff's Complaint fails to state a claim for which relief can be granted.

**SECOND DEFENSE**

Plaintiff's claims are barred, in whole or in part, for lack of standing.

**THIRD DEFENSE**

Verisk did not owe any duty or obligation to Plaintiff. To the extent that any such duty or obligation was owed, Verisk did not breach its duties or obligations. Verisk did not directly or indirectly perform any acts that would constitute a violation of any rights of Plaintiff or any duty owed to the Plaintiff.

**FOURTH DEFENSE**

Plaintiff's Complaint is barred, in whole or in part, by the doctrines of waiver, consent, and acquiescence.

**FIFTH DEFENSE**

Plaintiff's Complaint is barred, in whole or in part, because the Plaintiff, through its acts, conduct, and omissions, ratified the alleged conduct of which it now complains.

**SIXTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, on the grounds that Verisk is not liable for misappropriation by any other party, including its current or former subsidiaries.

**SEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, on the grounds that the purported trade secret information was readily ascertainable by proper means at the time of the alleged misappropriation.

**EIGHTH DEFENSE**

Plaintiff is not the owner of its purported trade secret information.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because alleged acts of misappropriation occurred before the Defend Trade Secrets Act of 2016's date of enactment. Pub. L. No. 114–153, 130 Stat. 376, 381–82.

## ELEVENTH DEFENSE

Plaintiff's claims and causes of action relating to trade secret misappropriation should be barred, in whole or in part, on one or more of the following grounds:

a. Verisk has not misappropriated any trade secrets belonging to Plaintiff;

b. Plaintiff cannot establish that Verisk acquired, used, or disclosed (by improper means or otherwise) trade secrets belonging to Plaintiff;

c. Any of Plaintiff's information used or transferred by Verisk contained no trade secret information belonging to Plaintiff;

d. Plaintiff does not allege with particularity or properly define what alleged trade secrets it is trying to protect;

e. Plaintiff has failed to establish that any of the information it seeks to protect rises to the level of or should be classified as a legal trade secret;

f. Plaintiff's alleged trade secrets were already in the public domain and/or Plaintiff shared this information with other third parties;

g. Plaintiff's alleged trade secrets were readily ascertainable or known to or within the industry;

h. Verisk has never relied on any such alleged trade secrets, took precautions to prevent the use of any such alleged trade secrets, and/or independently developed any accused products or services;

i. To the extent Plaintiff's information could constitute trade secret information, Plaintiff failed to take efforts that were reasonable under the circumstances to protect such alleged trade secrets from disclosure; and/or

j. Any other statutory or common law exclusions.

### TWELFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the economic loss rule.

### THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any cognizable damage or injury.

### FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrines of unclean hands and laches.

### FIFTEENTH DEFENSE

Plaintiff's Complaint is barred, in whole or in part, because Verisk has not been unjustly enriched. Further, Plaintiff's claims are barred in whole or part because Plaintiff would be unjustly enriched if it were allowed to recover any of the relief sought in the Complaint.

### SIXTEENTH DEFENSE

Plaintiff's claims for damages are speculative, ambiguous, illusory, and duplicative, and any award of damages against Verisk would be improper.

## SEVENTEENTH DEFENSE

Verisk cannot be held liable for any punitive, exemplary, or other similar damages, such as treble damages, because Verisk at all times made good faith efforts to comply with the law. Verisk denies that punitive and/or exemplary damages against Verisk are warranted, because at no time did Verisk act wrongfully or with malice, bad faith, or reckless indifference toward Plaintiff's rights under the law.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by their failure to mitigate its alleged losses or damages.

## NINETEENTH DEFENSE

Plaintiff comes to the Court with unclean hands that preclude any award of equitable relief, including because:

a. Plaintiff has brought this suit in bad faith;

b. Plaintiff failed to conduct an adequate investigation before bringing suit;

c. Plaintiff brought suit with an improper motivation to cause reputational harm to Verisk.

## TWENTIETH DEFENSE

In the event Plaintiff recovers a verdict or judgment against Verisk, or any party, for any past or future claimed economic loss related to the allegations herein, that verdict, judgment, or settlement must be reduced by any applicable collateral source or recovery and any double recovery is prohibited.

### TWENTY FIRST DEFENSE

Plaintiff's asserted damages against Verisk, if any, were proximately caused by independent, superseding, or intervening actions of parties or entities over whom Verisk has no authority or control.

### TWENTY SECOND DEFENSE

Plaintiff's request for injunctive relief should be barred, in whole or in part, on one or more of the following grounds:

a. Plaintiff cannot demonstrate a likelihood of success on the merits of its claims;

b. Plaintiff cannot demonstrate that any harm it will allegedly suffer by Verisk's allegedly wrongful conduct (which is denied) is or will be irreparable;

c. Plaintiff has an adequate remedy at law and/or cannot establish that a monetary remedy will be insufficient to make Plaintiff whole;

d. Plaintiff's undue delay shows that there is no irreparable harm and no threat of irreparable harm to Plaintiff in the future;

e. The harms suffered by Verisk, if enjoined, will greatly outweigh the harm that may be suffered by Plaintiffs if an injunction is not issued;

f. Injunctive relief does not serve, and will in fact harm, the public interest.

### ADDITIONAL DEFENSES

Verisk has not knowingly or intentionally waived any applicable affirmative or other defense and reserves the right to rely upon such defenses as may become available or apparent. Verisk further reserves the right to amend this Answer and/or affirmative defenses accordingly, and/or to withdraw affirmative defenses that Verisk determines are not applicable.

## VERISK'S PRAYER FOR RELIEF

Verisk respectfully requests that the Court enter judgment in its favor and against

Plaintiff, that Plaintiff take nothing against Verisk by its suit, and that the Court grant Verisk

such other and further relief as the Court deems just and proper.

DATED: February 19, 2025                    Respectfully submitted,

OF COUNSEL:                                  _/s/ Michael A. Barlow_____
                                             Michael A. Barlow (#3928)
William A. Burck                             QUINN EMANUEL URQUHART
QUINN EMANUEL URQUHART                          & SULLIVAN, LLP
   & SULLIVAN, LLP                           500 Delaware Avenue, Suite 220
1300 I Street NW, Suite 900                  Wilmington, Delaware 19801
Washington, DC 20005                         (302) 302-4000
(202) 538-8000                               michaelbarlow@quinnemanuel.com
williamburck@quinnemanuel.com
                                             *Counsel for Defendant Verisk Analytics, Inc.*
Viola Trebicka
Alexandre J. Tschumi
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
(213) 443-3000
violatrebicka@quinnemanuel.com
alextschumi@quinnemanuel.com

48